[Civ. No. 23168.   First Dist., Div. Two.   Oct. 24, 1966.]

PACIFIC SCIENTIFIC COMPANY, Plaintiff and Respondent, v. EUGENE A. GLASSEY et al., Defendants and Appellants.

832

Staniford, Harris & Loomis and John E. Loomis for Defendants and Appellants.

Pillsbury, Madison & Sutro, Noble K. Gregory, James N. Crittenden and Walter R. Allan for Plaintiff and Respondent.

SHOEMAKER, P. J.—Plaintiff Pacific Scientific Company (hereafter referred to as "Pacific") brought this action against defendants Eugene Glassey and Exactel Instrument Company (hereafter referred to as "Exactel") to recover damages for breach of a distributorship agreement.

The complaint alleged that on August 28, 1957, the parties entered into a written contract whereby plaintiff was to act as the exclusive distributor within a specified territory for the sale of certain products manufactured by defendants[1] and was to use its best efforts to promote the sale of such products; that plaintiff had performed its obligations under the contract but that defendants had violated a provision of the contract which required them to refer inquiries from potential customers within the territory to plaintiff, had sold their products directly to customers within the territory and had failed to pay plaintiff a commission on such sales; that defendants had also wrongfully terminated the contract and had made it impossible for plaintiff to continue to perform its obligations thereunder.

Defendants, by way of answer, denied having breached or wrongfully terminated the contract and further denied that plaintiff had performed its obligations thereunder. Defendants also affirmatively alleged that on September 8, 1960, they had notified plaintiff that they were terminating the contract for cause; that following the giving of such notice, plaintiff persuaded defendants to waive their right of termination and to extend the contract by written amendment; that plaintiff had induced defendants to agree to such extension by representing (1) that plaintiff would correct its sales deficiencies, (2) that plaintiff would promote at least 50 percent of the sales within its exclusive territory, and (3) that the contract could be canceled at defendants' option if they were not satisfied within the first year after the contract was extended that plaintiff's performance had markedly improved in accordance with the first two representations; that following the execution

---

[1]Although defendants are referred to collectively, it may be noted that the only parties to the 1957 agreement were plaintiff and defendant Glassey, who was then doing business under the fictitious name and style of Exactel Instrument Company. As of April 1, 1961, defendant Exactel Instrument Company was incorporated and succeeded to all rights and obligations under the contract and subsequent amendment thereto.

of the extension agreement, plaintiff continued to fail materially in its performance of the distributorship agreement.

Defendants also filed a cross-complaint wherein they reincorporated the affirmative allegations of their answer and further alleged that on August 31, 1961, defendant Exactel had notified plaintiff's attorneys of record that immediately upon the filing of plaintiff's complaint in the instant action, Exactel was terminating the distributorship agreement for plaintiff's failure to perform. Pursuant to the prayer of the cross-complaint, defendants sought to recover all commissions which they had paid plaintiff on sales made subsequent to November 8, 1960.[2]

After a trial without jury, the court made the following findings of fact: that on August 28, 1957, the parties entered into a written agreement whereby plaintiff was appointed the exclusive and sole distributor in California and certain additional Western states for the sale of certain precision equipment and instruments manufactured by defendants; that said agreement, which was drafted by plaintiff, obligated plaintiff to use its best efforts to promote the sale of defendants' equipment in the territory specified and obligated defendants to refer to plaintiff any direct inquiries which defendants might receive from potential customers within said territory; that the agreement created an exclusive right to sell defendants' products within the territory specified; that by letter of September 8, 1960, defendants attempted to terminate the agreement, but that subsequent thereto, plaintiff and defendants met and conferred and agreed upon an amendment to the agreement which was executed on January 10, 1961; that said amendment limited the number of defendants' products which were subject to the distributorship agreement, excluded certain areas from plaintiff's exclusive territory, and altered the amount of the commission which plaintiff was to receive on the sale of various items of equipment; that said amendment contained no other provisions and constituted the entire agreement between the parties;[3] that plaintiff made no other

[2]November 8, 1960, is apparently the date accepted by the parties on which defendants' contractual liability would have ceased under the notice of termination given on September 8, 1960.

[3]The amendment states that it shall operate retroactively to amend the 1957 agreement effective as of October 28, 1960, three years and two months after the execution of that agreement. The 1957 agreement was for an initial period of three years, to be followed by successive three-year periods unless either of the parties elected to terminate by giving notice 90 days prior to the end of any successive three-year period.

promises and did not agree, either orally or in writing, that defendants could terminate the agreement at their option if they were not satisfied with plaintiff's performance; that defendants thereafter failed to comply with the customer referral requirement of the distributorship agreement, in that early in 1961, defendants received an inquiry concerning a purchase of equipment subject to the agreement from the Radiation Laboratory of the University of California, which was located within plaintiff's territory, and failed to refer said inquiry to plaintiff; that defendants answered said inquiry, made a sale of equipment and instruments to the Radiation Laboratory, and never advised plaintiff of such action; that plaintiff subsequently learned of the sale from the Radiation Laboratory and demanded that defendants pay $10,261 as the commission due plaintiff on such sale, but that defendants refused to do so; that on September 22, 1961, defendants, without cause, wrongfully terminated and breached the agreement and thereafter refused to perform their obligations thereunder; that prior to such wrongful termination, plaintiff had fully performed all the terms and conditions which were required of it under the agreement; that in the absence of defendants' wrongful termination, plaintiff would have made substantial sales of defendants' equipment and instruments during the remainder of the term of the agreement and would have been entitled to commissions and profits on such sales; that defendants' wrongful termination deprived plaintiff of $18,550 as the amount of profits and commissions, less operating expenses, which plaintiff would have realized from the sale of defendants' equipment during the remainder of the term of the agreement.

The court concluded that plaintiff was entitled to recover damages in the total amount of $28,811 and judgment was accordingly entered. Defendants appeal therefrom.

Defendants first contend that there is no evidentiary support for the court's finding that plaintiff fully performed all of its obligations under the distributorship agreement. Defendants urge that plaintiff did not comply with the contractual provision requiring it to use its "best efforts to promote the application and sale" of defendants' equipment within its territory. In support thereof, they claim that certain "contact" reports which were prepared by plaintiff's sales-

Although not expressly stated in the court's findings, we consider that the execution of the amendment operated to extend the original agreement until August 28, 1963.

men following calls on prospective customers show that plaintiff actively promoted defendants' products only during the first few months following the execution of the 1957 agreement and that plaintiff thereafter became much less diligent in its efforts. Defendants also point out that plaintiff advertised defendants' products in its bi-monthly magazine twice during the year 1958 but failed to do so thereafter. Defendants further assert that plaintiff failed to promote the ''application'' of defendants' products because there was no evidence that plaintiff ever developed any new and different use for said products.

In presenting this argument, defendants are asking this court to ignore the conflicting evidence before the trial court. The evidence upon which defendants rely suggests that plaintiff employed less than its best efforts in the promotion of defendants' products. However, without reciting the same, we are satisfied from our examination of the record that there is more than ample evidence to the contrary.

Defendants' contention that plaintiff could not promote the application of their products, as required under the agreement, without developing an entirely novel use in connection with each sale, is an inherently unreasonable one which the court was not required to accept merely because the agreement was drafted by plaintiff rather than defendants.

Defendants next contend that the trial court erred in finding that the agreement gave plaintiff the exclusive right to sell defendants' products to customers within the territory specified. Defendants concede that the agreement made plaintiff an exclusive agent of defendants within said territory and thereby prohibited the appointment of another agent within that territory. However, defendants deny that the contract can reasonably be interpreted as prohibiting defendants from making their own direct sales to customers within the exclusive territory. This contention cannot be sustained.

■ *Harcourt* v. *Stockton Food Products, Inc.* (1952) 113 Cal.App.2d 901 [249 P.2d 30], *E. A. Strout Western Realty* v. *Gregoire* (1950) 101 Cal.App.2d 512 [225 P.2d 585], and *Snook* v. *Page* (1915) 29 Cal.App. 246 [155 P. 107], upon which defendants rely, are authority for the general rule that a contract which creates an exclusive agency to sell will not be held to create an exclusive right to sell, thus prohibiting a direct sale by the principal, *unless the contract expressly confers such an exclusive right upon the agent or contains other language indicating that the parties intended to prohibit*

*a direct sale by the principal or to guarantee the agent a commission in the event of such sale.*

In the instant case, the trial court expressly based its finding that the distributorship agreement did create an exclusive right to sell upon "the circumstances under which the agreement was made and performed, and the conduct of the parties and the language of the agreement. . . ."

An examination of the agreement reveals that while it does not expressly grant plaintiff an exclusive right to sell and merely appoints him the exclusive and sole distributor within the territory specified, the agreement does state that if defendants should "receive direct inquiries from potential customers in . . . [plaintiff's] territory . . . such inquiries shall be referred to the [plaintiff]." It cannot be doubted that the obvious, if indirect, effect of this provision is to guarantee plaintiff a commission on *all* sales to customers within its exclusive territory by prohibiting defendants from selling to any potential customers who might apply, for one reason or another, directly to defendants rather than to plaintiff. The conduct of the parties subsequent to the execution of the distributorship agreement also substantiates this construction, since defendant Glassey, the president of defendant Exactel, admitted in a deposition taken in September 1962 that the 1961 sale to the Radiation Laboratory constituted the first occasion on which he had failed to refer a customer inquiry to plaintiff and had undertaken to sell directly to a customer within plaintiff's territory. Glassey further admitted, both in his deposition and at the trial, that he was aware, immediately before he consummated the sale to the Radiation Laboratory, that such sale would "technically" violate the agreement with plaintiff. Under such circumstances, it is apparent that both the terms of the distributorship agreement and the conduct of the parties support the court's finding that said agreement gave plaintiff the exclusive right to sell defendants' products to customers within the territory specified.

Defendants next assert that even if plaintiff did have an exclusive right to sell within its territory, it would be unreasonable to hold that the agreement obligated defendants to refer to plaintiff customer inquiries which originated within defendants' own plant. Defendants assert that the inquiry from the Radiation Laboratory was made after the parties' agreement had been amended in such a way as to exclude from plaintiff's exclusive territory the county in which defendants' plant was located. Defendants reason that since the uncontra-

dicted evidence shows that the initial inquiry from the Radiation Laboratory was made within defendants' plant, and thus outside of plaintiff's exclusive territory, defendants were under no duty to refer it to plaintiff.

The validity of this argument obviously depends upon the proper meaning of that provision of the parties' agreement which required defendants to refer to plaintiff "direct inquiries from potential customers in . . . [plaintiff's] territory." Defendants are in effect suggesting that the phrase "in . . . [plaintiff's] territory" was intended to modify the word "inquiries" and that the provision, when correctly construed, required them to refer to plaintiff only those inquiries which were *received* in plaintiff's territory. Plaintiff, on the other hand, interprets the provision as requiring defendants to refer to it all inquiries, regardless of where such inquiries were received, which originated from customers whose places of business were located within its territory. The trial court accepted the latter construction, finding that the inquiry from the Radiation Laboratory was one which defendants were required to refer to plaintiff because the Radiation Laboratory "was located . . . within the exclusive territory of plaintiff, . . . and the instruments sold were to be used there."

The trial court's interpretation is supported by the wording of the provision itself, since it is apparent that defendants' position could be upheld only by rewriting or, at best, engaging in an extremely strained construction of the language employed. Moreover, it is not in the least unreasonable to assume that plaintiff would have wanted to obviate the possibility of defendants' making substantial inroads in its exclusive territory through the simple expedient of advising potential customers located therein to direct their inquiries to defendants' plant. Finally, defendant Glassey's own admission that he thought the Radiation Laboratory sale was technically violative of the parties' agreement lends support to the trial court's interpretation of the provision in question.

Defendants cite three cases in support of their contention that the court ought to have accepted their interpretation of the agreement. We are not persuaded that they apply to our problem. In *Golden Gate Packing Co.* v. *Farmers' Union* (1880) 55 Cal. 606, the court merely held that the parties' agreement did not create an exclusive right to sell in favor of defendant agent and that plaintiff was therefore at liberty to sell its own products anywhere it chose. In *Haynes Auto. Co.*

v. *Woodill Auto Co.* (1912) 163 Cal. 102 [124 P. 717, 40 L.R.A. N.S. 971], and *Parry* v. *American Motors etc. Co.* (1914) 25 Cal.App. 706 [145 P. 165], the particular language of the contracts in question indicated that the parties intended the place where a sale was made, rather than the place where the customer resided or had his place of business, to be determinative of the agent's right to recover a commission on a sale made by the principal.

On the other hand, the case of *Caro* v. *Mattei* (1918) 39 Cal.App. 253 [178 P. 537], relied upon by plaintiff, presents a situation more in point with the instant matter. There, the court concluded that defendant, who was employed as plaintiff's sole representative for the sale of wine and brandy outside the State of California, was entitled to receive a commission on certain sales which plaintiff had made at its California winery to customers conducting business outside California and thus within plaintiff's territory.

In the light of the foregoing, we believe that in this respect the agreement was properly construed.

██ Defendants also assert that the agreement did not require them to refer customer inquiries to plaintiff in instances where the same customer had previously been referred to plaintiff and it had failed to follow up the initial inquiry. Defendants contend that the Radiation Laboratory was a customer falling within this implied exception to the agreement because there was evidence that defendants had referred inquiries from that customer to plaintiff on two occasions in 1959 but that plaintiff had failed to follow up on these specific inquiries.

This argument ignores the fact that the trial court found that plaintiff had fully performed all of its obligations under the agreement and further found that plaintiff had used its best efforts to promote the application and sale of defendants' equipment to the Radiation Laboratory "including, among other things, its best efforts in following up the inquiries received from defendants." Again, the record amply supports these findings.

Defendants next challenge the sufficiency of the evidence to support the court's finding that plaintiff never orally agreed that defendants could terminate the agreement during the period following the execution of the amendment thereto, if they were not satisfied with plaintiff's performance. Here again, defendants have chosen to ignore the evidence in the record that supports this finding. Furthermore, evidence of

any such oral agreement would violate the parol evidence rule, since the written amendment, which the court found to constitute the entire agreement of the parties, contained no such provision. (Code Civ. Proc., § 1856.)

Defendants next assert that the trial court erred in computing damages on the basis of conjectured sales when there was a record of actual sales available. Plaintiff's president, Decker McAllister, described three different methods by which it would be possible to compute the damages sustained by plaintiff as a result of defendants' having wrongfully terminated the parties' agreement. McAllister first stated that during the period between the execution of the 1957 contract and the date of its termination in September 1961, plaintiff sold an average of $7,570 worth of defendants' products per month. If the $7,570 figure were to be extended over the remaining 24 months during which the agreement would have continued in effect in the absence of defendants' termination, this computation would result in a total of $181,680, as the amount of sales which plaintiff would have made during the period following termination of the agreement. Since plaintiff's average commission, during the period while the contract remained in effect, was 13 percent of the amount of each sale, plaintiff's gross profits during the period following termination would have been $23,618.40. However, McAllister was of the opinion that in the light of his considerable experience as a sales representative, this method of computing damages would result in a figure which was too low to realistically compensate plaintiff for the loss of profits resulting from defendants' wrongful termination of the agreement. He thus explained that with a contract of this nature, where the product in question is initially unfamiliar to prospective customers, the number and amount of sales would normally be expected to increase substantially over a period of years.

Under the second method, the award would be based upon the amount of sales which defendants actually made within plaintiff's territory during the period following the termination of the agreement. However, McAllister stated that this method of computing damages, which would entitle plaintiff to gross profits in the amount of $22,290.52 during the period following termination of the agreement, would also be inadequate to compensate plaintiff for its loss, since this method does not take into account the growth rate which plaintiff had already begun to achieve and presumably would have continued to achieve if the agreement had remained in effect.

In McAllister's opinion, plaintiff's damages could be realistically estimated only by using a third method, which would give consideration to the growth in sales which had already occurred before the contract was terminated and which would project that rate of growth into the future. McAllister had prepared such an estimate, which he characterized as being on the conservative side, and stated that if damages were computed by this method, the gross profits which plaintiff would have earned if defendants had not terminated the agreement would total $37,700.

McAllister also testified that if the contract had continued in effect, plaintiff's expenses would have equaled 30 percent of gross profit. McAllister explained that since defendants had terminated the agreement without prior warning, it was not possible for plaintiff to cut down its overhead expenses or to substitute another client in defendants' place. Upon termination of the agreement, plaintiff was accordingly able to eliminate nothing but direct expenses, such as telephone and telegraph charges and other out-of-pocket costs. An analysis prepared by plaintiff's accounting department indicated that these direct expenses had equaled 52 percent to 55 percent of gross profit during the period while the agreement remained in effect. However, McAllister stated that in order to give defendants the benefit of the doubt, he assumed that direct expenses had equaled 60 percent of gross profit. He next cut this percentage in half because, in his opinion, the period prior to termination of the agreement was one in which plaintiff had done the pioneering work necessary to develop a market for defendants' products and had realized relatively few sales as a result of the money and effort expended in promoting defendants' products. In McAllister's opinion, the period following termination of the agreement would have been far more fruitful for plaintiff because it had been successful in developing sales to the point where it could reasonably expect many repeat orders while incurring relatively little expense. McAllister was therefore of the opinion that during the period following termination of the agreement, plaintiff's expenses would have equaled 30 percent of gross profits.

The trial court found that in the absence of defendants' wrongful termination of the agreement, plaintiff would have made gross profits in the amount of $26,500 and net profits in the amount of $18,550 during the period following termination. The difference between the two figures ($7,950) is equal to 30 percent of gross profits.

Defendants correctly point out that the court's finding that plaintiff lost anticipated gross profits in the amount of $26,500 could not have been based upon plaintiff's average gross profits prior to termination of the agreement nor upon the actual sales made by defendants after such termination, since the former method of computing damages would have limited plaintiff's anticipated gross profits to $23,618.40 and the latter method to $22,290.52. We think it obvious that the court must have believed McAllister's testimony that neither method would adequately compensate plaintiff for its loss and must have given some consideration to the likelihood that the growth in sales which had been achieved prior to termination of the agreement would have continued during the period following termination if plaintiff had not been prevented from continuing to perform its obligations under the agreement. Defendants contend that the trial court erred in considering this evidence because damages may not be based upon conjectured, speculative sales but only upon the actual sales which defendants made within plaintiff's former territory during the period following termination of the agreement. This contention may not be upheld.

Although defendants have cited various cases holding that actual sales afford a proper basis for determining the amount of profits which would have been earned but for a breach of contract, they have failed to cite a single case holding that actual sales are the *only* proper measure of damages. We have found no authority for any such inflexible rule, and are satisfied that the correct measure of damages in any given case must always be that amount which will compensate the aggrieved party for all the detriment proximately caused by the breach of contract, "or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.)

It is well established that one whose wrongful conduct has rendered difficult the ascertainment of damages cannot complain because the court must make an estimate of damages rather than an exact computation. (*Zinn* v. *Ex-Cell-O Corp.* (1944) 24 Cal.2d 290 [149 P.2d 177].) Thus, the amount of anticipated profits lost as a result of a breach of contract need not be established with certainty and "It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of the contract." (*Nelson* v. *Reisner* (1958) 51 Cal.2d 161, 171-172

[331 P.2d 17] ; to the same effect, see *Stott* v. *Johnston* (1951) 36 Cal.2d 864, 875-876 [229 P.2d 348, 28 A.L.R.2d 580].)

█ We find ample evidence in support of the court's implied finding that if plaintiff had not been prevented from performing its contractual obligations, it would have made considerably more sales during the period following termination of the agreement than defendants were themselves able to make. The court was clearly entitled to consider plaintiff's status as a firm which had long done business as a manufacturers' sales representative, which employed a highly trained and qualified sales staff and which had many established customers in the area. In addition, McAllister's testimony and the actual sales records themselves indicate that with an agreement of this nature, which required plaintiff to familiarize its customers with a new and unfamiliar product, sales could reasonably be expected to increase, and did in fact increase, over the course of the years. Although plaintiff sold only $36,112 worth of defendants' products within its territory during the year 1958, such sales totaled $72,360 during the first eight months of 1961. Moreover, while plaintiff's sales averaged $7,570 per month during the entire period preceding termination of the agreement, defendants' sales of their own products during the 25-month period following termination averaged only $6,779 per month.

█ Defendants finally contend that there is no evidentiary support for the court's finding that plaintiff's expenses during the period following termination of the agreement would have equaled 30 percent of its gross profits. This contention fails in the light of McAllister's detailed explanation, discussed above, as to the manner in which he arrived at his estimate of 30 percent. Defendants also appear to be suggesting that McAllister's statement that plaintiff's expenses were approximately 60 percent of gross profit during the period prior to termination, but would have been only half that amount during the period following termination, amounts to an admission that plaintiff intended to sit back and reap large profits, during the period following termination, without making any effort to promote defendants' products. This argument is specious, since it is apparent that if plaintiff continued to expend exactly the same amount of effort after termination as it did prior to termination, its expenses, if measured as a percentage of gross profit, would still decrease by one-half if sales doubled. It is also apparent that the initial period of the agreement could reasonably be expected to entail

a greater expenditure of effort on plaintiff's part, since it was then attempting to familiarize its customers with a new and unknown product. Once this objective had been achieved and defendants' products had been successfully utilized by various customers, it is not in the least unreasonable to assume that plaintiff would have received unsolicited repeat orders at subsequent periods in the agreement.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.