**CRAIG TAYLOR EQUIPMENT COMPANY, an Alaska Corporation, Appellant,**

v.

**PETTIBONE CORPORATION a/k/a Pettibone Mulliken Corporation, Appellee.**

**PETTIBONE CORPORATION a/k/a Pettibone Mulliken Corporation, Cross-Appellant,**

v.

**CRAIG TAYLOR EQUIPMENT CO., an Alaska Corporation, Cross-Appellee.**

**Nos. 5315, 5372.**

Supreme Court of Alaska.

Feb. 18, 1983.

---

H. Bixler Whiting, Whiting & Rosie, Fairbanks, for appellant/cross-appellee.

Julian C. Rice, Rice, Hoppner, Brown & Brunner, Fairbanks, Richard J. Rappaport and Karen K. Phillips, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for appellee/cross-appellant.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Chief Justice.

This is a dispute over the proper interpretation of two distributorship agreements entered into between Pettibone Corporation ("Pettibone"), a heavy equipment manufacturer, and Craig Taylor Equipment Company ("Craig Taylor"), its distributor in Alaska.

Pettibone is a leading manufacturer of a wide variety of railroad, construction, mining, industrial, and materials handling equipment. From its executive offices in Chicago, Illinois, it operates fifteen plants located throughout the United States, as well as plants in Canada and Mexico. Its branch offices conduct equipment sales in twenty-three states and six foreign countries. Pettibone also sells its equipment through numerous independent distributors.

Craig Taylor has been the Pettibone distributor for the State of Alaska since 1964.

The agreements in issue are Pettibone's standard distributor contracts, which were executed in September of 1969; one covers sales of cranes, the other forklifts, but they are otherwise substantively identical. The relevant terms of the agreements between Craig Taylor and Pettibone are as follows:

*Paragraph 2* ("Territory and Products") states that Craig Taylor's territory is the State of Alaska, with the exception of the easternmost portion of the state, and lists "National Accounts" among an enumeration of the various markets open to the distributor.

*Paragraph 3* ("No Competitive Lines") is the distributor's promise not to "act as representative for, or sell" any products that would compete with those covered by the agreement.

*Paragraph 11* ("No Split Commissions") provides in part:

The Distributor has the right to solicit and receive orders for Company's equipment or parts only from any prospect who has a home office, job office or residence in his territory regardless of the destination or point of delivery of the equipment except when the products of the Company, as herein designated are sold for use outside of the continental boundaries of the U.S.A. When a product is shipped outside of the Distributor's territory [a specified percentage, depending on the product] of the list price will be withheld from the Distributor and credited to the Distributor into whose territory the product is shipped. The Distributor into whose territory the product is shipped, shall be responsible for servicing this product.

*Paragraph 12* ("Direct Sales") provides: The Company reserves the right to fix the amount of commission, if any, on sales to the U.S. Government and its Agencies, to other manufacturers, to captive and major railroads, or on sales made

outside the continental limits of the U.S.A. The Company reserves the right to bid directly to all other customers in the Distributor's territory, but agrees to pay the Distributor on all such direct sales at least 50% of the normal discount.

Craig Taylor filed suit against Pettibone in September 1976, seeking commissions and service fees under the Distributor's Contracts on certain sales of equipment manufactured by Pettibone and sold by its branch offices. Pettibone denied in its answer that it owed Craig Taylor any sums.

In November 1978, Craig Taylor moved for summary judgment, claiming commissions under paragraph 12 totalling more than $211,000 and service fees under paragraph 11 totalling nearly $47,000 on the following sales transactions:

(a) Sixteen cranes and seven forklifts sold by Pettibone's Los Angeles Sales Branch between December 1974 and June 1976 to the Ralph M. Parsons Company ("Parsons") of Pasadena, California;

(b) One forklift sold by Pettibone's Los Angeles Sales Branch in February 1976 to C.F. Braun Company ("Braun") of Alhambra, California;

(c) One forklift sold by Pettibone's Nebraska Sales Branch in February 1978 to Peter C. Kiewit and Sons Company ("Kiewit") of Omaha, Nebraska.

Craig Taylor sought, in addition, commissions totalling more than $17,000 and service fees in excess of $3,000 on the lease of four cranes by Pettibone to Braun in January 1976.

In June 1979, Craig Taylor's motion for summary judgment was granted as to service fees but denied as to commissions. Final judgment was entered dismissing the claim for commissions due on the leases,[1] but trial was set for the commissions claimed due on the sales. After more discovery and new motions, summary judgment was entered in favor of Pettibone in

---

1. Craig Taylor's claim that a lease is "one aspect" of a sale and is therefore covered by the provisions of paragraph 12 is given no more than a cursory statement in the argument portion of the brief and will not be considered on

appeal by this court. *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980); *Lewis v. State,* 469 P.2d 689 (Alaska 1970); *Pederson v. State,* 420 P.2d 327, 332 n. 2 (Alaska 1966).

March 1980. Final judgment on that award was filed in April 1980, and each party claimed to be the "prevailing party" for purposes of attorney's fees under Civil Rule 82. Since each party had won a summary judgment on a major issue, both sides were declared "prevailing parties" and neither were given costs or fees. Craig Taylor appeals the summary judgment on the issue of commissions, and Pettibone cross-appeals the summary judgment on the issue of service fees and the denial of costs and attorney's fees.

I

We first address the issue of whether commissions are owed by Pettibone to Craig Taylor. In this appeal from summary judgment, Craig Taylor does not argue that there are any material issues of fact yet to be resolved. Rather it asserts that the trial court erroneously interpreted paragraph 12 of the distributor's contract by holding that Craig Taylor was not entitled to any commissions arising from Pettibone's direct sales to the California offices of Parsons and Braun and the Nebraska office of Kiewit.[2] Because the facts relating to the circumstances surrounding the execution of this contract are not in dispute, the interpretation of paragraph 12 "is treated in the same manner as questions of law and the standard used in reviewing factual findings is inapplicable."[3]

▮ Contracts are to be interpreted so as to give effect to the reasonable expectations of the parties, that is, to give effect to the meaning of the words which the party using them should reasonably have apprehended that they would be understood

by the other party. *Arctic Contractors, Inc. v. State,* 564 P.2d 30 (Alaska 1977); *Wessells v. State, Department of Highways,* 562 P.2d 1042 (Alaska 1977); *Day v. A & G Construction Co.,* 528 P.2d 440, 443–46 (Alaska 1974). In ascertaining the reasonable expectations of the parties, this court has looked in the past to the language of the provisions in controversy, to the language of the contract as a whole, to the objects sought to be accomplished by the contract, to the circumstances surrounding its adoption, and to the case law interpreting similar provisions. *Wright v. Vickaryous,* 598 P.2d 490 (Alaska 1979); *Stordahl v. Government Employees Insurance Co.,* 564 P.2d 63 (Alaska 1977); *Hendricks v. Knik Supply, Inc.,* 522 P.2d 543, 546 (Alaska 1974). We will also keep in mind that the contracts in issue were drafted and supplied by Pettibone, and that, as a rule, form contracts are to be construed against the furnishing party. *Wessells,* 562 P.2d at 1048; *Duncan v. City of Fairbanks,* 567 P.2d 311 (Alaska 1977).

▮ Whether or not Craig Taylor is entitled to commissions on Pettibone's direct sales to Parsons, Braun and Kiewit turns upon our interpretation of paragraph 12 which provides in part:

The Company reserves the right to bid directly to *all . . . customers in the Distributor's territory,* but agrees to pay the Distributor on all such direct sales at least 50% of the normal discount.

(Emphasis added.) The question as this court perceives it, is whether the offices with which Pettibone made its direct sales were "customers in [Craig Taylor's] territory."

**2.** Pettibone's argument that sales by the company's Los Angeles and Nebraska sales branches did not constitute sales by "the company" as that term is used in paragraph 12 is without merit. These branches are part of Pettibone's International Sales Branch Organization. They are "captive," wholly-owned subsidiaries which style themselves as "direct factory branch sale/service outlet[s];" substantial amounts of company capital, time, and talent have been devoted to their development. Pettibone promotional materials highlight the fact that they allow the company "to move men, parts and

machinery around, as though on a giant chess board, out of an area which was in the midst of an economic recession to another which was enjoying comparative prosperity. Such flexibility is virtually impossible with other organizations." We will not now permit the company to disassociate itself from so vital a part of its operations.

**3.** *Wessells v. State, Dept. of Hwys,* 562 P.2d 1042, 1046 n. 9 (Alaska 1977) (*citing National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 586 (Alaska 1976)).

We find that Parsons, Braun and Kiewit were within Craig Taylor's class of potential customers. Paragraph 11 of the agreement provides:

> The Distributor has the right to solicit and receive orders . . . only from any prospect who has a home office, job office or residence in his territory regardless of the destination or point of delivery of the equipment. . . .

A literal interpretation of this language indicates that a distributor may sell equipment to two distinct classes of customers. The distinction between these two classes rests upon the physical location of the customer's purchasing office. One class of customers consists of those purchasing offices which are physically located within the distributor's territory, (in-territory customer). The other class consists of those purchasing offices which are located outside the territorial boundaries of the distributor, yet have some connection with the distributor's territory in that the company also maintains a job office, home office, or residence within the distributor's territory, (out-of-territory customer).[4]

At oral argument, Pettibone stated that Craig Taylor could have solicited orders from the out-of-territory offices of Parsons, Braun and Kiewit at any time. Thus, Pettibone's intent is consistent with this literal interpretation of paragraph 11. The fact that Craig Taylor's contract listed as part of its market "National Accounts" also tends to show that the parties intended distributors to have the right to solicit orders from out-of-territory offices. We conclude that the reasonable interpretation of paragraph 11 is that it creates two classes of distributorship customers: in-territory customers and out-of-territory customers.

The disputed transactions in this case involve this latter class of customers. The Pettibone sale to Parsons was transacted at Parson's Pasadena, California office; the Braun sale with Braun's Alhambra, California office; and the Kiewit sale with Kiewit's Omaha, Nebraska office. Although none of the offices were located within Craig Taylor's territory, all three companies did have the requisite connection with Craig Taylor's territory in that each company maintained a job office within Craig Taylor's territory.[5] Therefore, the out-of-territory offices of Parsons, Braun and Kiewit with which Pettibone made its direct sales were Craig Taylor's *customers* as this term is used in paragraph 12.[6]

We next must resolve whether these customers were "in [Craig Taylor's] territory." Pettibone interprets the word "territory" in a strict geographic sense. It argues that the customers were not "in [Craig Taylor's] territory" since the offices of Parsons, Braun and Kiewit which purchased the equipment were located outside the geographic boundaries of Craig Taylor's territory.

---

4. In this latter class of customers, the fact that the job or home office is not authorized to purchase equipment is of no importance since the customer is the out-of-territory purchasing office. The job or home office requirement simply appears to be a limitation on the distributor's ability to compete for customers in other distributors' territories.

5. Parsons employs a resident construction manager whose address is a P.O. box in Anchorage; Braun maintains a job office in Kenai; Kiewit's job office is located in Fairbanks.

6. Pettibone contends that "customer" in paragraph 12 should be taken to mean one with whom the vendor has an established business relationship. We believe such a reading is in plain conflict with the language of the contract and with the reasonable expectations of the parties. Paragraph 12 reserves, in the first

sentence, the right of the company to fix commissions for sales to certain enumerated, *potential* purchasers. The section then goes on to speak of "all other customers." The term "customers" in paragraph 12 therefore properly denotes "prospects" as that term is used in paragraph 11, as well as persons or businesses with whom the vendor has an established sales relationship. The terms "customer" and "prospect" are interchangeable for purposes of the contract and will be used interchangeably in this opinion. As we stated in *Stordahl v. Government Employee Ins. Co.*, 564 P.2d 63, 66 n. 7 (Alaska 1977), "[c]ontracts should not be interpreted in a manner which creates conflict among various provisions, and the court should, if possible, give effect to all parts of the instrument."

Craig Taylor rejects Pettibone's geographic meaning of the word "territory" and instead argues for a functional interpretation. It asserts that since a distributor may solicit customers outside its geographic territory under paragraph 11, Pettibone's obligation to pay split commissions should likewise encompass Pettibone's direct sales to a distributor's out-of-territory customers as well. In other words, the distributor's "territory," for purposes of commissions under paragraph 12 is coextensive with the scope of the distributor's clientele under paragraph 11, not with the physical boundaries of the territory.

The unreasonableness of Craig Taylor's interpretation of paragraph 12 becomes clear when we consider the real world situation where not one distributor, but three or four distributors are trying to make a sale to a particular customer. Under Craig Taylor's interpretation, when Pettibone steps in and makes a direct sale to a customer's office, there may be several distributors entitled to the commission since any distributor, in whose territory there is located a company's job or home office, can solicit an order from an out-of-state office of that company.

The case law likewise provides no support for Craig Taylor's broad interpretation of the language "in the Distributor's territory." In *Unita Oil Refining Co. v. Ledford,* 125 Colo. 429, 244 P.2d 881 (Colo.1952), the court held that under an agreement which credited the distributor for direct sales "to persons resident in [the distributor's] area," the distributor was entitled to payment for sales made outside the territory at the manufacturer's refinery to a resident of the distributor's area. This is distinguishable from the case at bar in that in *Unita,* the manufacturer transacted the sale with an "in-territory" customer. In the case at bar, Pettibone sold equipment to Craig Taylor's "out-of-territory" customers.

The case of *Pacific Scientific Co. v. Glassey,* 245 Cal.App.2d 831, 54 Cal.Rptr. 235 (Cal.App.1966) is similarly distinguishable. In *Pacific Scientific,* it was agreed that Pacific Scientific was to act as the sole and exclusive distributor in California for the sale of equipment manufactured by Glassey; the contract further required that the manufacturer refer to the distributor any "direct inquiries from potential customers in ... [the distributor's] territory." *Id.* 54 Cal.Rptr. at 239.

The manufacturer received at its plant an inquiry from the University of California's Radiation Laboratory, but did not refer the inquiry to the distributor; the inquiry was answered and a sale of equipment made. The court upheld the trial court's determination that under the agreement, the inquiry from the laboratory was one which the manufacturer was "required to refer to [the distributor] because the Radiation Laboratory 'was located ... within the exclusive territory of [the distributor]' ...." *Id.,* 54 Cal.Rptr. at 240. This again is distinguishable from the case at bar since Pettibone made its sale, not with one of the job offices located within the physical boundaries of Craig Taylor's territory, but rather with the customers' California and Nebraska offices, located outside Craig Taylor's territory.

We therefore reject Craig Taylor's interpretation of paragraph 12. However, we also decline to adopt Pettibone's interpretation which would limit our inquiry to the geographic location of the purchasing offices of Parsons, Braun and Kiewit.

Our interpretation of paragraph 12 rests upon our conclusion that Pettibone's obligation to pay the split commission is the *quid pro quo* for the distributor's promise in paragraph 3, "not to act as a representative for or sell any competitive products." Without the split commission provision, a distributor would be reluctant to concentrate its resources and efforts on marketing only Pettibone products, if at any time Pettibone could enter the distributor's territory and sell equipment to the distributor's own customers, thereby reaping the benefits of the distributor's marketing efforts. Therefore, in determining whether a direct sale was made to a customer "in the Distributor's territory," we will ask whether the sale took place within the physical bounda-

ries of the distributor's territory. Factors relevant to the determination of the locus of sale are the place of solicitation; place of negotiation; place where the equipment was demonstrated; place where the contract was signed; and place where the purchasing office is located.

An examination of the record in this case indicates that Pettibone's direct sales to Parsons, Braun and Kiewit had no connection with Craig Taylor's territory other than the fact that the equipment would be shipped for use within Craig Taylor's territory after its purchase. The solicitation, negotiation, demonstration of equipment, and signing of the contracts either occurred at Pettibone's branch offices or the customers' purchasing offices located in California and Nebraska. Pettibone therefore did not intrude into Craig Taylor's territory when it made the direct sales involved in this case. Absent entry by Pettibone into Craig Taylor's territory, the split commission of paragraph 12 is not operative. We hold that Craig Taylor's customers, to whom Pettibone directly sold equipment, were not "in [Craig Taylor's] territory" for purposes of the split commission provision of paragraph 12. The decision of the trial court as to commissions owed on the Parsons, Braun and Kiewit purchases is affirmed.

## II

We turn now to address Pettibone's claim that the trial court erroneously interpreted paragraph 11. The court held that Craig Taylor was entitled to service fees only upon performance of service work.

Paragraph 11 of the Pettibone Distributor's Contract was amended in June 1967 to include the following:

When a product is shipped outside of the Distributor's territory, [some percentage of the list price, depending on the product] will be withheld from the Distributor and credited to the Distributor into whose territory the product is shipped. The Distributor into whose territory the product is shipped, shall be responsible for servicing this product.

Craig Taylor learned of the addition to Item 11 of the Distributor's Contract in a letter from Pettibone dated June 5, 1967. Pettibone explained in its letter that the scheme was set up largely to eliminate complaints by shipping distributors and customers that the receiving distributors were not fulfilling their service responsibilities.

Pettibone's letter then set out detailed procedures by which the distributor would become entitled to his credit:

To eliminate all complaints, we are initiating the following system:

1. Service Reports will be filled out by all Distributors (per attached detailed instructions).

2. *Upon returning the completed Service Report, Pettibone Michigan Corporation will pay the Servicing Distributor for this service.*

3. The five percent charge of the Cary Lift or Skidder list price will be applied to all Cary Lift and Skidder invoices. This includes Cary Lift and Skidder invoices on units shipped within the selling Distributor's territory as well as units outside of the selling Distributor's territory.

4. *The five percent charged to all Distributors on all Cary Lifts or Skidders will be paid to the servicing Distributor upon receipt by the Factory of the completed Service Report form, per the following schedule.*

| | | |
|---|---|---|
| a. | Report # 1—delivery and intallation | 2.0% |
| b. | Report # 2—30-day service and inspection | 1.5% |
| c. | Report # 3—90-day service and inspection | 1.5% |
| | Total | 5.0% |

(Emphasis added.) The attached detailed instructions read as follows:

1. Upon notification from the Factory of the shipping destination of the Cary Lift or Skidder, the Regional Manager shall send Report # 1 to the servicing Distributor for execution.

2. *The Distributor shall deliver and/or install the Cary Lift or Skidder with the customer and completely fill out Service Report # 1.*

3. The Distributor shall return the completed Service Report to the Regional Office for approval.

4. The Regional Manager shall forward the approved Service Report to the Regional Office for approval.

5. *The Factory upon receipt of the approved Service Report shall immediately credit the Distributor who is shown on the Service Report form.*

6. Service Report # 2 and # 3 are processed as above . . . .

These same procedures appear to have been followed regardless of the type of equipment involved. Their clear import is that the distributor was not entitled to payment except upon performance of actual service work. Credit was dependent upon completion of a service report and was apportioned according to the type of service performed.

Pettibone's letter of June 5 was reviewed, signed, and accepted by Mr. Craig Taylor, president of Craig Taylor Equipment Company. The procedures outlined therein plainly set out that service fees were to be paid only upon the completion of service work and receipt by Pettibone of the completed service report. Craig Taylor's argument that paragraph 11 requires only that it hold itself ready to perform service work is refuted by the fact that the parties provided for separate compensation for each of the three service calls, to be paid "upon receipt of the approved Service Report." The record persuades this court that Craig Taylor understood this procedure, that this procedure was in fact followed by Craig Taylor when servicing any Pettibone equipment, and that Craig Taylor was paid for service work that was actually performed. Accordingly, we hold that the parties understood and intended that paragraph 11 would entitle distributors to service fees

only when they had performed actual service work.

Craig Taylor asserts that even if Pettibone's promise to pay was conditioned upon the actual performance of service work, it is nevertheless entitled to service fees because Pettibone "attempted to perform service work itself in violation of the contract." [7] The Restatement (Second) of Agency states that "[t]he principle does not, by contracting to pay compensation contingent upon the agent's success in accomplishing a definite result, thereby promise that he will not compete either personally or through another agent." Restatement (Second) of Agency § 449 at 361 (1958). There is nothing in the language of the contract or in the record to suggest that Pettibone intended, by making the distributor responsible for servicing equipment shipped into his territory, to give Craig Taylor an exclusive right to perform warranty services. The rule with respect to exclusive sales agencies is applicable here:

> [A] contract which creates an exclusive agency to sell will not be held to create an exclusive right to sell, thus prohibiting a direct sale by the principal, unless the contract expressly confers such an exclusive right upon the agent or contains other language indicating that the parties intended to prohibit a direct sale by the principal or to guarantee the agent a commission in the event of such a sale.

*Pacific Scientific Co. v. Glassey,* 54 Cal. Rptr. at 239. While Pettibone indeed promised to pay fifty percent of the distributor's normal discount on direct sales to customers in the distributor's territory not otherwise reserved to the company, it made no promise that it would not perform warranty work on equipment shipped into the distrib-

---

**7.** Craig Taylor states in its brief that Pettibone attempted to "avoid" the provisions of paragraph 12 "by sending Pettibone personnel to both Washington and Alaska to perform service work, and by agreeing, as part of the sale, to set up a service school in Craig Taylor's territory." Craig Taylor concedes, however, that the service school was never in fact set up. Furthermore, of the 25 machines sold by the company, only seven appear to have been actu-

ally serviced by Pettibone; of these, all but two received service at the request of the customer *prior* to their shipment into Alaska. None appear to have been given more than the initial servicing. The four cranes leased to Braun similarly received, only initial servicing prior to their shipment into the distributor's territory. It is not clear from the record whether or by whom the Kiewit purchase was serviced.

utor's territory, not that it would compensate the distributor in the event it does such servicing.

Pettibone has an enormous stake in the reputation of its products and the good will of its customers. Distributors, on the other hand, may represent a wide variety of products from a variety of suppliers; the demands of the territory and the limited resources of the distributor may combine to result in incomplete or inadequate service. In the absence of an express agreement to the contrary, it would be manifestly unreasonable to suppose that Pettibone intended to give up its right to provide direct service to its customers. We hold, accordingly, that Pettibone was not acting in violation of its contract when it serviced machines sold to the customers involved in this lawsuit, and that Craig Taylor, as a result, is not entitled to prevail on its claim for service fees. The decision of the trial court on the issue of service fees is reversed. Since there are no triable issues of fact, we order that summary judgment be entered in favor of Pettibone on the issue of service fees.

### III

Pettibone argues that the trial court's denial of attorney's costs and fees amounted to an abuse of discretion under Civil Rule 82(a).

Because we have reversed the trial court as to the service fees issue, we reverse and remand the issue of attorney's fees.

AFFIRMED in part, REVERSED in part.

CONNOR, J., not participating.