[Civ. No. 23768.   First Dist., Div. Three.   Nov. 21, 1967.]

JACK V. SPRINGER, Plaintiff and Appellant, v. ROBERT R. SINGLETON, Defendant and Respondent.

Henry E. Morse, Jr., Spurr, Brunner & Nelson and W. H. Brunner for Plaintiff and Appellant.

Crump, Bruchler & Crump and Frederic S. Crump for Defendant and Respondent.

SALSMAN, J.—Appellant Springer brought this action against respondent Singleton seeking damages on the ground that Singleton had induced Jerome Siemsen, George Siemsen and Jean Taylor (Siemsen) Rich to breach their contract to sell certain real property to him. The trial court entered judgment in favor of respondent Singleton, and Springer appeals.

There is little dispute as to the facts. The Siemsens owned a tract of land in Lake County known as the "Slaughter House Property." Springer, a real estate broker, knew the property was for sale, and had shown it to prospective buyers on several occasions. Singleton, a school teacher, was a neighbor of Springer's. He became interested in the purchase of the Siemsen property and talked with Springer about it. Springer and Singleton decided to acquire the property together. Springer visited the sellers on May 6, 1961, and discussed the proposed sale with them. On May 15th, Springer and Singleton opened an escrow with Lakeport Title Guaranty Company. Springer deposited $1,000 in the escrow; Singleton deposited $5,000.

On May 22d, Springer, for tenuous reasons stated in his testimony, and without Singleton's knowledge, ordered the escrow at the Lakeport Title Guaranty Company closed. The next day, also without Singleton's knowledge, Springer visited the Siemsens and secured their signature to a deposit receipt and agreement to sell in which he and his wife alone were named as buyers. On the 22d, Singleton learned that the Springer-Singleton escrow had been cancelled. The next day, or very shortly thereafter, Singleton also learned that Springer had contracted alone with the sellers to take title in his own name and had cut him out of the transaction completely. Singleton was angry and protested vigorously to the sellers, but the latter, having no notice of any rights in Singleton, properly stood by their agreement with Springer and rebuffed Singleton's protests.

Because of Springer's conduct, Singleton refused to put up money for the purchase of the property in Springer's name, although discussion of a possible interest in the property for Singleton was continued between Springer, Singleton and Singleton's attorney.

By the terms of Springer's deposit receipt and agreement with the sellers, Springer had until June 23d to deposit the $8,178 down payment. At the time the agreement was executed Springer put up $200. On June 22d he opened an escrow with the Lakeport Title Guaranty Company and deposited $4,000 in the account. He never deposited any further funds in the escrow account, but later stated, in effect, that he was waiting for Singleton to put up his share.

Singleton had notice of the terms of sale to Springer. He knew that Springer had until June 23d to put up his $8,178 deposit as the down payment. Singleton emulated Springer's example. After Springer's time to make the down payment had expired, Singleton—unknown to Springer — asked a friend, Harold Riggle, to approach the sellers and attempt to purchase the property for him. On June 24th, Riggle visited Jerome Siemsen and offered to purchase the property. He was told the property "was sold," but later in the conversation Siemsen asked Riggle to "write a letter" if he was interested. Riggle reported to Singleton. The letter was written, but nothing came of it.

On July 20th Riggle met Jerome Siemsen by chance and asked him how the sale of the Slaughter House Property was coming along. Siemsen invited Riggle to come to his nearby office, and there again told Riggle that, as far as he knew, the property was sold. He invited Riggle, however, if still interested, to write a letter to the sellers' attorney, offering to purchase. Again Riggle reported to Singleton, and such a letter was written.

A week or two after July 20th, Siemsen visited Riggle's place of business in the morning. He asked if Riggle was still interested in the property and Riggle said he was. Late that afternoon Siemsen came back and told Riggle he could buy the property. Riggle testified: "The last time that Mr. Siemsen called on me, it was in the morning, and I would say the nearest I can guess it would be probably around ten o'clock. He was alone, only with this gentleman that was driving the car. He said, 'Are you still interested in this property?' He said, 'If you are, we are going up to Lakeport right now to the attorney's office and we are going to settle it right now one way or the other.' Q. And what did you reply, if any-

thing? A. I said, 'Well, I am still interested in it.' And so in the afternoon, again I am guessing at the time, I would say probably around four or 4:30, he come in and he said, 'If you are interested,' he says, 'you can buy the property.' He says, 'It's yours.' And I said, 'Well, Mr. Siemsen,' I says, 'I'm curious to know whether Mr. Springer is free and clear of this?' And he says, 'He has nothing to do with it.' And I said, 'I certainly don't want to get myself into hot water and get into a lawsuit because,' I says, 'that is costly and I haven't the time.' And he said, 'He has nothing more to do with it.' He says, 'He's through.' He said, 'If you want it, put your money up.' And he says, 'That's it.' "

On August 8th, the sellers agreed to sell to Riggle. The terms of sale were substantially the same as those contained in the Siemsen-Springer agreement. The sale to Riggle was completed promptly. On August 25th, Riggle and one McElroy, who was also a nominal purchaser, deeded the property to Singleton, but this deed was not recorded until several months later.

When Springer discovered that the property had been sold to Singleton he brought this action to recover damages for what he claimed was Singleton's interference with his contract rights with Siemsen. At trial, Springer testified that, near the end of the 30-day period during which he was to put up his down payment, he had a conversation with Jerome Siemsen, and the latter had told him that ". . . the time limit didn't mean anything, to go ahead and work it out, just to get it going whenever I could." But none of the sellers were called as witnesses to confirm appellant's testimony, and the trial court undoubtedly weighed this testimony against other evidence of the sellers' statements and conduct.

The trial court found that Springer never deposited the down payment or the purchase price in accordance with the terms of his contract with the Siemsens, and that Singleton did not induce or procure the sellers to break their agreement.

Although tort liability for interference with contract rights is of comparatively recent origin, it is now well established. (See *Imperial Ice Co.* v. *Rossier,* 18 Cal.2d 33 [112 P.2d 631] ; Prosser's Law of Torts (2d ed.) ch. 23; 2 Witkin, Summary of Cal. Law (1960) Torts, §§ 157, 158; 36 Harv.L.Rev. 663 (1923) ; 41 Harv.L.Rev. 728 (1928).) ▉ Generally, in order for a plaintiff to recover against a defendant who has caused a breach of contract, the plaintiff must show, (1) that he had a valid and existing contract, (2) the defendant had

knowledge of the contract and intended to induce its breach, (3) the contract was in fact breached by the other contracting party, (4) the breach was caused by the defendant's unjustified and wrongful conduct, and (5) that the plaintiff has suffered damage.

Here appellant Springer first argues that when Singleton obtained his contract to purchase the Slaughter House Property, he (Springer) still had a valid and subsisting contract with the Siemsens. He points to his uncontradicted testimony to the effect that Jerome Siemsen, one of the sellers, told him ". . . the time limit didn't mean anything. . . ." and the further evidence that even after the 30-day period had expired, Jerome Siemsen still regarded the contract as being in effect. Appellant argues that once the time provision was waived, the sellers lost the right thereafter to insist upon strict performance without first giving reasonable notice to him of their intentions, citing *Pease* v. *Brown,* 186 Cal.App.2d 425, 429 [8 Cal.Rptr. 917] ; *Carberry* v. *Trentham,* 143 Cal. App.2d 83, 89 [299 P.2d 966] ; *Lifton* v. *Harshman,* 80 Cal. App.2d 422, 433 [182 P.2d 222], and 50 Cal.Jur.2d 304.

The trial court did not make a specific finding as to the existence of a valid contract between Springer and the Siemsens at the time the latter sold their property to Singleton. Rather, the court "assumed," although "not completely satisfied," that the Siemsens had breached their contract with appellant. The court based its judgment on two separate and distinct grounds, first that there was no showing that respondent had knowledge of an existing, enforceable contract between Springer and the Siemsens, and second, there was no showing that the acts of Singleton or his agent Riggle had caused or induced the Siemsens to breach their contract.

One of the essential elements of a plaintiff's cause of action against a defendant who is alleged to have caused a breach of contract is a showing that the defendant had knowledge of the contract and intended to induce its breach. (*Freed* v. *Manchester Service, Inc.,* 165 Cal.App.2d 186, 189 [331 P.2d 689].) In *Imperial Ice Co.* v. *Rossier, supra,* 18 Cal.2d 33, 37, our Supreme Court declared: "The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or his actions were not intended to induce a breach, he cannot be held liable though an actual breach results from his lawful and proper acts. (Rest., Torts, sec. 766, comment e; . . .)" (See also *Augustine* v. *Trucco,* 124 Cal.App.2d 229, 246-247 [268 P.2d 780].)

Although the trial court did not expressly find that respondent had no knowledge of the existence of a contract between Springer and the Siemsens, such a finding may readily be implied from the evidence and the court's discussion of the evidence in its memorandum of decision. The trial court pointed out that, while respondent knew of the contract between Springer and the Siemsens, he also knew that the contract had an expiration date, and that Springer had not performed within the time fixed. Moreover, there was uncontradicted evidence that, long after the date fixed for Springer's performance, Jerome Siemsen sought out respondent's agent and told him Springer was "out of it." The court concluded: "It would thus appear that the requirement that defendant have knowledge of the existence of the contract on August 9, 1961, the day the deposit receipt was entered into between the sellers and defendant's agents, was lacking." The evidence fully supports an implied finding that respondent did not have knowledge of the existence of the contract between Springer and the Siemsens at the time respondent is alleged to have caused its breach.

The trial court expressly found that respondent did not induce the Siemsens to breach their contract with appellant. This finding is warranted by the evidence, which shows that respondent made no move to purchase the Slaughter House Property until the original Springer contract had expired. After making his first offer and being told by the sellers that the property was sold, respondent withdrew, and did nothing except to put his offer in writing at the request of the sellers. Only after being told by the sellers that Springer had not performed and was "out of it" did respondent take steps to buy the property through his agent Riggle. Thus, ample evidence supports the trial court's finding on the issue of causation. (See *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183] and *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757].)

Since appellant has failed to establish essential elements of his cause of action, the judgment of the trial court in respondent's behalf is obviously correct and is therefore affirmed.

Draper, P. J., and Bray, J.,* concurred.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.