[No. E000636. Fourth Dist., Div. Two. Feb. 6, 1986.]

RAMONA MANOR CONVALESCENT HOSPITAL,
Plaintiff and Respondent, v.
CARE ENTERPRISES et al., Defendants and Appellants.

COUNSEL

Okazaki & Coontz, M. Stephen Coontz, Reid, Babbage & Coil, Reid & Hellyer, Donald F. Powell and Alexandra S. Ward for Defendants and Appellants.

Hopper, Kanouff, Smith, Peryam, Terry & Duncan, Stephen M. Duncan, Swarner & Fitzgerald and Lewis F. Jacobsen for Plaintiff and Respondent.

OPINION

**KAUFMAN, Acting P. J.**—Plaintiff Ramona Manor Convalescent Hospital (Ramona), the prospective operating lessee of a nursing home, sued defendants Care Enterprises et al. (Care), the holdover operating lessee of the same facility, for damages on three legal theories: (1) intentional interference with the contractual relations between it and the owner of the property, J&S Medical Group, Inc. (J&S), (2) intentional interference with Ramona's prospective economic advantage, and (3) disgorgement under the doctrine of unjust enrichment of profits Care realized as holdover lessee. J&S, the owner, also filed suit against Care seeking damages for interference with its contractual relations with Ramona, interference with prospective economic advantage and indemnification for any liability J&S might have had to its lessee Ramona. Ramona's action against Care was consolidated for trial with J&S's lawsuit. In the Ramona case, a jury found in favor of Ramona on all three of its theories, and the trial court entered judgment against Care for $404,153 compensatory damages and $2.5 million punitive damages. Care appeals from that judgment. A judgment in the J&S action

awarding J&S $18,299 in damages against Care was fully satisfied, and J&S is not a party to this appeal.

## Facts

In 1969, J&S purchased real property in Hemet, California, and by 1970 had constructed a 99-bed skilled nursing facility thereon. J&S leased the facility to Geriatrics, Inc., not a party to these proceedings, to operate for a period of 10 years ending June 30, 1980. The lease also included two 5-year options to renew.

On January 26, 1973, Geriatrics, Inc. subleased the facility to Care, reserving the two 5-year options to renew.[1] Care operated the facility for the remainder of the lease period. Care intermittently informed the owner, J&S, that it was interested in negotiating an extension of the lease beyond June 30, 1980, but J&S was not altogether satisfied with Care as a tenant and greeted these overtures with mixed responses, never agreeing to renew or extend the lease.

By early 1980, J&S had definitely decided not to renew the lease, and J&S's president, Phillip Jensen, initiated negotiations for a new lease arrangement with several other parties. Out of these negotiations was born plaintiff Ramona, a partnership in which J&S itself became a one-third partner.

On April 28, 1980, before Ramona was officially in existence, J&S notified Care by telephone that its lease would not be renewed and that J&S was negotiating a new operating lease with an unnamed third party, who would take possession on July 1, 1980. J&S confirmed this communication by letter dated April 29, 1980. Care responded by letter of May 9, 1980, declaring its intent to remain in possession after the lease expiration on June 30, 1980. This response was apparently based on Care's asserted belief that communications between it and J&S over the preceding several months constituted an enforceable oral contract to renew the lease.

The Ramona partnership was officially created, and the lease agreement between it and J&S executed, on June 12, 1980. On June 30, 1980, the last day of its sublease, Care filed an action against J&S seeking a declaration of its right to remain in possession and an injunction to prevent any interference by J&S with its possession. The following day, July 1, 1980, J&S cross-complained for unlawful detainer, including a request for damages

---

[1] Geriatrics, Inc. subsequently waived its options to renew.

caused by Care's continued possession. Pursuant to court order, Care retained possession and paid J&S for use of the facility throughout the pendency of that litigation (the unlawful detainer litigation), including an appeal to this court.

In the unlawful detainer litigation the trial court decided in favor of J&S, finding that J&S never made an oral promise to Care to renew or extend the lease and that J&S was entitled to be restored to possession and to recover damages for Care's unlawful detention of the property. On February 18, 1983 in an unpublished opinion this court affirmed the judgment in the unlawful detainer litigation in all respects. (4 Civ. 25788.)

The present action was tried in late August and early September of 1983, after all aspects of the unlawful detainer litigations were completed. Judgment was entered on special jury verdicts, which included the following seven findings:

1. Care intentionally interfered with a contract to which Ramona was a party;

2. The total amount of damages suffered by Ramona from Care's contractual interference was $27,194;

3. Care intentionally interfered with Ramona's prospective economic advantage;

4. The total amount of damages Ramona suffered from Care's interference with its prospective economic advantage was $2.5 million;

5. Care was unjustly enriched when it held over on its lease;

6. Care should be required to disgorge to Ramona all profits realized during the holdover period; and

7. The amount of such profits to be disgorged was $395,258.

The trial court's amended judgment purported to "clarify" the $2.5 million awarded by the jury for intentional interference with prospective economic advantage as actually being punitive damages.[2]

---

[2]The court's action in this regard was based on a question asked the jury foreman in open court, as to the exact nature of the $2.5 million figure entered in the space for interference with prospective economic advantage damages on the special verdict form. The foreman responded: "That is strictly punitive. We felt that was a punitive question."

## Care's Contentions on Appeal

Care contends the special verdicts finding it liable for interference with contractual relations and advantageous economic relations (hereinafter the business torts) were not supported by substantial evidence because there was no evidence it intended to interfere with either the contractual or economically advantageous relationship between Ramona and J&S; indeed, it did not even know of Ramona's existence or name. Care separately but relatedly urges the trial court's instructions on the intent requisite to liability on the business torts were prejudicially erroneous under *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158].

Care also contends that in granting Ramona recovery on both the business torts and the unjust enrichment theory the jury failed to follow an express instruction of the court; that the unjust enrichment theory should not have been submitted to the jury, but rather was a question for the court; that this is not a proper case for recovery on the theory of unjust enrichment and that the amount awarded Care on that theory is not supported by substantial evidence.

In other contentions, Care assails the punitive damage award, arguing the requisite malice, fraud or oppression could not have been borne towards a party whose identify Care did not know. Alternatively, Care suggests the punitive damage award, even if substantively supported by the evidence, was excessive as a matter of law for want of proportionality to the compensatory damages. Care also asserts the punitive damage award was procedurally defective, because the same nine jurors failed to agree on both compensatory and punitive awards.

On other procedural grounds, Care argues that because inadequate discovery was afforded, Ramona's economic expert at trial, Carl Heintz, should not have been permitted to testify and that the trial court erred in denying Care's Evidence Code section 352 motion to exclude testimonial reference to the earlier unlawful detainer litigation and in permitting into the jury room an informal damage summary prepared for oral argument by Ramona's counsel which had not been introduced into evidence.

Care's final contentions focus upon J&S's status as one-third owner of the Ramona partnership. Because J&S recovered separately under unlawful detainer and business tort theories, Care urges the judgment in favor of Ramona must be reduced by one-third to reflect J&S's interest in Ramona and to prevent J&S from realizing a double recovery. It is also argued the pro-

hibition against splitting a cause of action or the doctrine of res judicata should bar any recovery by J&S on the tort claims by Ramona in this action.

We have concluded the evidence is sufficient to support Care's liability on the tort theories, but that the unjust enrichment award was inappropriate and that because of that and other problems relating to damages, the judgment must be reversed as to damages.

## 1. *Care's Business Tort Liability*

### a. *Substantial Evidence—Intent to Interfere*

■ To establish Care's liability for intentional interference with contractual relations [IIK] or intentional interference with prospective economic advantage [IIPEA], Ramona was required to show: (1) a valid and existing contract with J&S [for IIK] or an economic relationship with J&S likely to produce a future economic benefit [for IIPEA], (2) Care's knowledge of this contract or relationship, (3) Care's intentional acts intended or designed to disrupt this contractual or economically advantageous relationship, (4) actual disruption of the relationship, and (5) resulting damages. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865]; *Shamblin* v. *Berge* (1985) 166 Cal.App.3d 118, 122-123 [212 Cal.Rptr. 313].)

■ Care is correct that proof of the requisite intent required more than a showing it intended the act which caused the interference; it required evidence that Care intended to cause the interference itself. The California Supreme Court recently considered "the role of 'intent' or 'motive' in the tort of 'intentional interference with contractual relations'" in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 765. The court there explained in pertinent part: "Intentional interference with contractual relations has its roots in the tort of 'inducing breach of contract.' Both are *intentional* torts. As this court explained in an early case, 'The act of inducing the breach must be an intentional one. If the actor had no knowledge of the existence of the contract or *his actions were not intended to induce a breach, he cannot be held liable though an actual breach results* from his lawful and proper acts. (Rest., Torts, sec. 766, comment e; [citations].)' (*Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33, 37 [112 P.2d 631], italics added; *Charles C. Chapman Building Co.* v. *California Mart* (1969) 2 Cal.App.3d 846, 853 [82 Cal.Rptr. 830]; *Springer* v. *Singleton* (1967) 256 Cal.App.2d 184, 188 [63 Cal.Rptr. 770, 27 A.L.R.3d 1220].)

"The Restatement section cited by the court explains, 'The essential thing is the *purpose to cause the result*. If the actor does not have this purpose, his conduct does not subject him to liability under this rule *even if it has the unintended effect of deterring the third person from dealing with the other.*' (Rest., Torts, § 766, com. d, italics added.) It is not enough that the actor intended to perform the acts which caused the result—he or she must have intended to cause the result itself.

"In recent years, the tort of 'inducing breach of contract' has expanded to permit liability where the defendant does not literally induce a breach of contract, but makes plaintiff's performance of the contract 'more expensive or burdensome' (*Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 232 [11 Cal.Rptr. 97, 359 P.2d 465]), or interferes with the formation of a *prospective* economic relationship (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865]). The requirement that the defendant act with culpable intent, though, has remained.

"Thus, in an action for inducing breach of contract it is essential that plaintiff plead and prove that the defendant '*intended* to induce a breach thereof . . . .' (*Abrams & Fox* v. *Briney* (1974) 39 Cal.App.3d 604, 608 [114 Cal.Rptr. 328], italics added; *H & M Associates* v. *City of El Centro* (1980) 109 Cal.App.3d 399, 405 [167 Cal.Rptr. 392]; *Richardson* v. *La Rancherita* (1979) 98 Cal.App.3d 73, 80 [159 Cal.Rptr. 285]; *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 78 [154 Cal.Rptr. 43]; see *Imperial Ice Co.* v. *Rossier, supra,* 18 Cal.2d at p. 39.) Similarly, to prevail on a cause of action for intentional interference with prospective economic advantage, plaintiff must plead and prove '*intentional* acts on the part of the defendant *designed* to disrupt the relationship.' (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827, italics added; *Institute of Veterinary Pathology, Inc.* v. *California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 126 [172 Cal.Rptr. 74]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18-19 [144 Cal.Rptr. 664].)

 "Only if and when plaintiff establishes an 'intent to interfere' does the issue of 'justification' come into play. (*Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 18-19.) '[W]hile defendant's culpable *intent* is an element of the cause of action to be pleaded and proved by plaintiff, defendant's *justification* is an affirmative defense' in the torts of interference with an existing or prospective economic relationship. (*A. F. Arnold & Co.* v. *Pacific Professional Ins., Inc.* (1972) 27 Cal.App.3d 710, 714 [104 Cal.Rptr. 96].) It is here that defendant's *motive* for intentionally interfering becomes relevant. 'Given the intention to interfere with the contract, liability usually will turn upon the ultimate purpose or object which

the defendant is seeking to advance.' (Prosser, Torts (4th ed. 1971) § 129, p. 942.)" (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at pp. 765-766.)

■ Applying those principles to the case at bench, while the jury might have concluded, but in view of its award of punitive damages obviously did not conclude, that Care was not motivated by any particular desire to interfere with the contractual or advantageous economic relationship between Ramona and J&S, the jury's implied determination that Care intended to interfere with those relationships is amply supported by the evidence.

On May 9, 1980, when Care informed J&S, the landlord, of its intention to retain possession of the nursing facility beyond the lease termination date of June 30, 1980, Care had already been informed by J&S's attorney in a letter dated April 29, 1980, that "J&S is in process of negotiating a new lease with *another operator* to commence on July 1, 1980. . . ." (Italics added.) This letter had been preceded by a telephonic communication the day before to the same effect. Care manifested its awareness of this prospective contractual relationship in its letter of May 9, 1980, to J&S, asserting its claimed belief that J&S had orally promised to renew its lease: ". . . [T]he Landlord is not legally able to lease [the facility] to another person or entity as mentioned in your letter . . . dated April 29, 1980."

This evidence establishes that on July 1, 1980, when it intentionally retained possession rather than surrendering the premises to J&S, Care was aware J&S had entered into a relationship with someone other than itself for future operation of the nursing facility and knew that this prospective operator's contractual rights would be frustrated by Care's actions. Ramona's resulting inability to take possession of the facility and realize its economic expectancy under the lease is not in dispute.

■ Essentially admitting the foregoing factual setting to be true, Care submits it cannot be held liable under either business tort theory because at the time it held over, it only had knowledge of the existence of a new lessee but lacked knowledge of its name or identity. Ramona does not dispute that Care lacked knowledge of its identity and name until December 1980, about six months after the expiration of Care's sublease. Without the specific awareness of the injured party's identity, Care argues, the quality of its knowledge and intent is insufficient for the purposes of either business tort and, a fortiori, could not constitute the requisite malice, fraud or intention to oppress necessary to uphold the jury's award of punitive damages (see discussion of punitive damages, *infra*).

We are not persuaded knowledge of the injured party's specific identity or name is a prerequisite to recovery for either IIK or IIPEA. Care itself has led us to an authority we find persuasive with respect to this point. Care quotes the following passage from the Restatement Second of Torts: "To subject the actor to liability under this rule, his conduct must be intended to affect the contract of a specific person. It is not enough that one has been prevented from obtaining performance of a contract as a result of the actor's conduct. . . . [¶] . . . Only when the actor's conduct is intended to affect a specific person is the actor subject to liability under this rule." (Rest.2d Torts, § 766, com. *p.* pp. 15-16.) However, Care failed to quote another passage found in the same section and the same comment which qualifies the portion it did quote and which seems to us dispositive of the point: "The rule does not require, however, that the person who loses the performance of the contract as a result of the conduct of the actor should be specifically mentioned by name. It is sufficient that he is identified in some manner . . . ." (*Id.,* at p. 15.)

Care's decision to hold over beyond the termination of the lease under which it had possession was made with the knowledge that such action would frustrate the legitimate contractual expectations of a specific, albeit unnamed, new lessee. That is all it was required to know to incur liability.

Care's reliance on *DeVoto* v. *Pacific Fid. Life Ins. Co.* (9th Cir. 1980) 618 F.2d 1340 is misplaced. In that case, applying its prognostication of what California law would be, the Ninth Circuit reversed an IIPEA judgment in favor of two mortgage insurance brokers against a mortgage lender which had allegedly induced breach of an agreement the brokers had negotiated between two mortgage insurers, from which the brokers expected to receive commissions. Concluding the brokers' relationships with the mortgage insurers were too remote from and no part of the impetus for the lender's allegedly tortious act, the court concluded the brokers were not entitled to recover for IIPEA.

While there is language in the opinion to the effect that a motive or purpose to injure must be proved as a prerequisite to recovery for the tort of IIPEA (see 618 F.2d at pp. 1347-1349), which we do not believe is consistent with the analysis in *Seaman's,* the essential reasoning of the court is disclosed by its statements that intentional interference with a contract ". . . does not always vest third or incidental persons with a tort action against the one who interfered. . . . [I]t is necessary to identify those whom the actor had a specific motive or purpose to injure by his interference and to limit liability accordingly" (618 F.2d at p. 1347) and, later, "[t]he business relation between the brokers and American [one of the mortgage insurers]

was of no concern to the defendants. Commissions anticipated by the broker[s] did not, in any degree, motivate the defendants' interference with the contract between Bankers [the other mortgage insurer] and American. The object of the interference was the principal contract, not the brokers' arrangement incidental to it. The brokers and their commissions were entirely unrelated to any motivation of the defendants, and it was not the goal or design of the interference to acquire the value of the commission. Absent a motive or purpose to injure the plaintiffs, or to appropriate an economic advantage belonging to them, or some other aggravating circumstances, the acts of Bankers or Pacific were not tortious as to the plaintiffs." (618 F.2d at p. 1349.)

■ Here, Ramona's loss was neither remote from nor merely incidental to the tortious interference. Ramona suffered directly when its legitimate expectations under a signed lease for operation of the facility were stultified by Care's refusal to redeliver possession to J&S. The *DeVoto* court itself recognized that a nonremote, primary party to a contract or prospective economic relationship, like Ramona, could properly recover under these business tort theories. It expressly stated: ". . . [S]uch tortious interference occurred in this case when [defendant] induced the breach of the principal contract in order to transfer American's competitive advantage to itself, and *we assume such conduct would be actionable in a suit by American.*" (618 F.2d at p. 1348, italics added.)

b. *Jury Instructions*

■ Care separately contends the jury was improperly instructed on intent and the permissible manner of its proof at trial. Relying on the *Seaman's* case, Care argues the instructions as given allowed the jury to infer Care's liability for IIK and IIPEA merely by determining that Care intentionally refused to surrender possession of the facility when its lease terminated. Care urges these instructions violated the rule of *Seaman's*: "It is not enough that the actor intended to perform the acts which caused the result— he or she must have intended to cause the result itself." (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d at p. 765.) We believe not.

In *Seaman's,* the Supreme Court struck down a jury instruction which stated: "A defendant *is deemed* to have acted intentionally if it knew that disruption or interference with an advantageous relationship was substantially certain to result from its conduct." (*Id.,* at p. 767, italics added.) Delivery of this instruction constituted error, because it *required* the jury

to find the requisite intent existed if it concluded the defendant intended the act and knew interference was substantially certain to result.

However, no such instruction was given here. On the contrary, the trial court twice instructed the jury, once when enumerating the elements of the torts and again when explicating the intent element, that Ramona was required to prove Care committed intentional acts *"designed to disrupt"* the relationship.[3] The *Seaman's* court expressly used the phrase "designed to disrupt" as equivalent to "intended to induce a breach." (See 36 Cal.3d at p. 766.)

In addition, the trial court did not tell the jury the requisite intent was "deemed" established by any particular circumstances in the fashion condemned in *Seaman's*. Rather, the court delivered several instructions, which we quote in relevant part, informing the jury of a number of factors it might consider and one or more inferences which are permissible when intent is to be shown by circumstantial evidence: " 'Intent' is defined by the law as that purpose or aim, or state of mind with which a person acts or fails to act. [¶] Ordinarily, it is reasonable to infer that a person intends the natural and probable consequences of his acts." (Plaintiff's instn. B.) "Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operation of the human mind. You *may infer* a party's intent from the *surrounding circumstances*. [¶] *You may consider any statement made, or act done or omitted* by a representative of a party whose intent is an issue, and *all of the facts and circumstances* which indicate his state of mind. [¶] Furthermore, in determining the Defendants' intentions, the law *assumes* that every person intends the natural and probable consequences of his or her knowingly done acts. [¶] Thus, if you find that the conduct of a representative of the Defendants' [*sic*] was knowingly done,

---

[3]The two instructions stated in pertinent part: 1. ". . . [I]n the first and third causes of action [the business tort theories], the plaintiffs have the burden of establishing by a preponderance of the evidence all the facts necessary to prove . . . that the Defendants committed intentional acts *designed to disrupt* the relationship between the Plaintiffs . . . ." (Defendants' instn. No. 1, italics added.)

2. "In order to find that the act of the Defendants . . . was intentional, it is not necessary that you find that the refusal [to leave the property owned by J&S] was designed to harm either of the Plaintiffs. You may find that the refusal was intentional if it was *designed to disrupt* the contract or the prospective business relationship between the Plaintiffs, whether to benefit the Defendants or for any other purpose." (Plaintiff's instn. G, italics added.)

Later the court instructed on privilege in pertinent part as follows: "The Plaintiffs cannot recover against the Defendants in this action if the Defendants' actions were priviledged [*sic*] or justified. [¶] You must find that the Defendants' actions were priviledged [*sic*] and justified if you find that the Defendants remained in possession of the property that is the subject of this action in the good faith and reasonable belief that they acted properly in doing so, even if they were wrong in that belief." (Defendants' instn. 4.)

you *may* draw the inference and find, *unless the contrary appears from the evidence,* that the Defendants intended the natural and probable consequences of that conduct." (Plaintiff's instn. C, italics added.)

Care asserts that, by telling the jury the law *assumes* people intend the natural consequences of their knowingly done acts, the court erred in the same way the trial court erred in *Seaman's* in giving its "is deemed" instruction. Not so. Read as a whole the "law assumes" instruction told the jury it could permissibly infer the requisite intent from Care's knowing refusal to surrender possession of the property unless the contrary appeared from the evidence. The instruction was wholly consistent with *Seaman's* where the court took pains to point out: "Intent, of course, may be established by inference . . . . Thus, the trial court *could properly have instructed* the jury that it *might infer culpable intent from conduct 'substantially certain' to interfere* . . . ." (36 Cal.3d at p. 767, word "might" italicized in the original, other italics added.)

Finally, the jury was specifically instructed ". . . not to single out any certain sentence or any individual point or instruction and ignore the others," but instead to consider all the instructions as a whole and to regard each in the light of all the others. (See, e.g., *Wittenbach* v. *Ryan* (1976) 63 Cal.App.3d 712, 719 [134 Cal.Rptr. 47].) Thus, the "law assumes" instruction had to be and presumably was understood not only in light of all its own language but also in light of the court's other instructions, including the two "designed to disrupt" instructions. There is no reasonable likelihood the jury was misled.

The record does indicate, as Care points out, that during deliberations the jury sent the court a note which read: "on Ques. #1 the word *intentionally* has hung us up[.] Can you give us any guidance." (Italics in original) The court wrote at the bottom of this note, "court gave jury [plaintiff's] B, C and G." We interpret the court's notation to mean it either reread these three instructions (see text and fn. 3, *ante*) to the jury or delivered them in written form to the jury for use in its further deliberations. The court's response in this respect was appropriate, and did not, as Care contends, overemphasize the "law assumes" instruction by failing to repeat the "designed to disrupt" instruction. Instruction G, which was one of the three instructions reread or delivered in written form to the jury, expressly included the "designed to disrupt" requirement. (See fn. 3, *ante*.) It is, of course, settled in California that no error arises from a court's choice to reread instructions in response to jury requests for further information, so long as the original instructions themselves do not constitute incorrect state-

ments of law. (See *Kumelauskas* v. *Cozzi* (1961) 191 Cal.App.2d 572, 575 [12 Cal.Rptr. 843].)

### c. *Evidence of Earlier Unlawful Detainer Litigation*

■ Care asserts the trial court failed to exercise its discretion in denying Care's Evidence Code section 352 motion in limine to exclude all testimonial and documentary reference to its prior unlawful detainer litigation with J&S. Care's assertion of prejudicial error relies principally on the requirement the trial court make an affirmative record of its exercise of discretion to facilitate meaningful review. (*People* v. *Green* (1980) 27 Cal.3d 1, 24-25 [164 Cal.Rptr. 1, 609 P.2d 468]; *Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 400, fn. 23 [196 Cal.Rptr. 117].)

Contrary to Care's suggestions, however, the record contains affirmative indications the trial court fully understood and executed its duty to weigh the probative value against the prejudicial effect of the evidence relating to the unlawful detainer litigation. Most importantly, during the arguments on the motion, the court expressly referred to the potential prejudice involved; the court then agreed out loud that the countervailing consideration of the evidence's probative value depended upon how essential it was to proving plaintiff's case-in-chief. In addition, the court took considerable time to consider the motion; it heard several other motions and took a recess prior to announcing its denial of the motion before the initiation of opening arguments. Finally, in taking the matter under submission the court spoke of its intention to ". . . give that some thought," and in announcing its denial, declared that it had in fact done so. The record clearly indicates the court understood the law to be applied and then took time to consider the matter and exercise its discretion. We do not interpret *Green* and its progeny as requiring anything more.

We also reject Care's argument that the court's ruling constituted an abuse of discretion. The proffered evidence was highly relevant to Care's affirmative defense of justification and privilege and was far more helpful than harmful in enhancing the jury's understanding of the arrangement under which Care compensated J&S for use of the skilled nursing facility pending completion of the unlawful detainer litigation. The discretion to be exercised is that of the trial court, not the appellate court, and the trial court's ruling will be upheld in the absence of a manifest abuse of discretion resulting in a miscarriage of justice. (*Cain* v. *State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 798 [121 Cal.Rptr. 200].) No such abuse of discretion or miscarriage of justice here appears.

## 2. *Unjust Enrichment Recovery*

██ Obviously, any loss of profits suffered by Ramona as a result of Care's interference with the lease between J&S and Ramona for operation of the nursing facility could be recovered under the cause of action for IIK. Indeed, with the exception of the possibility of punitive damages, one would expect lost profits to constitute the major element of damages to be recovered under that theory. Nevertheless, apparently concerned about its ability to prove its loss of profits because it was a new venture without operating history and because its loss of profits resulted from its inability to gain possession of the facility and operate it, Ramona included in its complaint a count for unjust enrichment by which it sought to recover from Care *the profits Care realized* during the period of its wrongful possession. Then even though the jury was instructed by the trial court that in determining Ramona's damages under the tort theories, it could "consider evidence of . . . the actual *profits received by Defendants* from their management of the Hemet facility between July 1, 1980, and May 31, 1983" (italics added), Ramona prevailed upon the court to instruct the jury on the unjust enrichment theory. And, of course, one of the jury's special verdicts awarded Ramona $395,258 on the unjust enrichment count, representing the profits realized by Care during its wrongful possession.

Care attacks the unjust enrichment recovery on several bases: that in awarding damages on both the business torts and the unjust enrichment theory the jury failed to follow an express instruction of the court; that this is not a proper case for recovery on the theory of unjust enrichment; that the amount awarded Care on the unjust enrichment theory is not supported by substantial evidence and that the matter of unjust enrichment, being equitable in nature, should not have been submitted to the jury. We have concluded that two of Care's contentions are meritorious and dispositive of the validity of the unjust enrichment recovery. It will therefore be unnecessary for us to resolve Care's other contentions on this point.

Care is correct the jury failed to obey an express instruction of the trial court not to make awards both under the tort theories and the unjust enrichment theory. Instruction "P" read in pertinent part: "If you find that the Plaintiff, Ramona Manor Convalescent Hospital, is entitled to a verdict against the Defendants for either intentional interference by the Defendants with a contract between the Plaintiffs, or intentional interference by the Defendants with an advantageous business relationship between the Plaintiffs, and if you further award Ramona . . . damages in an amount which will reasonably compensate it for any losses proximately caused by the Defendants, then you *may not* in addition find in favor of that Plaintiff on

its claim of unjust enrichment." (Italics added.) Nevertheless, in its special verdicts the jury found defendants liable on each of the tort theories, but also found the defendants were unjustly enriched, and proceeded to make separate money awards on each count. While we are confident the award of $27,194 on the IIK count did not include Ramona's loss of profits, we cannot with confidence say what really was included in the $2.5 million award originally designated as damages for IIPEA but later designated punitive damages, so we are unable to uphold the unjust enrichment recovery on the theory that it merely represents Ramona's lost profits which should have been awarded by the jury under the IIK count. This is particularly true because, as already indicated, the jury was instructed it could consider the profits earned by Care during its wrongful possession in assessing damages on the tort counts.

Moreover, we have concluded that Care is correct that the circumstances of this case were not appropriate for any recovery under the theory of unjust enrichment. Section 129, subsection (1), of the Restatement of Restitution provides in relevant part: "A person who tortiously has taken possession of another's land without the other's consent is not thereby under a duty of restitution to the other for its value or use . . . ." Illustration 1 to section 129 reads: "A disseises B of Blackacre and opens a store thereon, making thereby a profit of $10,000. The reasonable rental value of the land is $1000 for the period occupied by A. In addition to regaining the land, B is entitled only to $1000 in an action of tort. B is not entitled to maintain an action of assumpsit."

The principal reason given by the authors of the Restatement for this rule is found in the comment on subsections (1) and (2) to section 129: "The liability of a trespasser or of a dispossessor in an action of tort . . . is normally as great as would exist if an action for restitution were allowed, since the person entitled to possession is entitled not only to be given possession if he does not have it, but also to damages for the deprivation, which ordinarily are determined by the value of the use of the land during the unlawful occupation, and in addition to damages for any harm done to the land." The authors of the Restatement fully recognized that in some situations the tortious acquisition of a benefit will give rise to an action for restitution. (Rest., Restitution, § 3.) However, they expressly state: "The principle [that a person is not permitted to profit by his own wrong at the expense of another] has not yet crystallized into a rule since, as is indicated by Chapter 7, *it is only in certain types of situations that restitution is permitted.* The desirability of permitting restitution in such cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and, as

stated in the Introductory Note to Chapter 7, *the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies . . . ."* (*Id.*, com. *a*, italics added.) Thus, what the authors of the Restatement have explained in their comment on subsections (1) and (2) to section 129 is that no action for restitution is given in cases of wrongful dispossession of land because the remedy in tort damages is adequate. This, of course, is fully consistent with the general principle of equity that equitable relief will not be afforded when the plaintiff's remedies at law are adequate to redress his or her injury. (See *Philpott* v. *Superior Court* (1934) 1 Cal.2d 512, 515 [36 P.2d 635]; *Taliaferro* v. *Taliaferro* (1956) 144 Cal.App.2d 109, 113 [300 P.2d 726]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 3, p. 5230.)

Accordingly, an action for unjust enrichment is inappropriate in the circumstances of the case at bench because Ramona can obtain full redress for its loss of profits under its action for IIK. Indeed, because it was deprived of any opportunity to show with certainty the profits it would have realized during the period of Care's wrongful possession by Care's refusal to give up possession, it would be altogether appropriate that its loss of profits be measured by Care's actual profits during that period, just as the trial court instructed the jury. "It is well established that one whose wrongful conduct has rendered difficult the ascertainment of damages cannot complain because the court must make an estimate of damages rather than an exact computation." (*Pacific Scientific Co.* v. *Glassey* (1966) 245 Cal.App.2d 831, 842 [54 Cal.Rptr. 235]; accord *Clemente* v. *State of California* (1985) 40 Cal.3d 202, 219 [219 Cal.Rptr. 445, 707 P.2d 818], and cases there cited; Rest.2d Torts, § 912, com. *a*, at p. 479.)

### 3. *Other Damages Problems*

 Our conclusions that the unjust enrichment recovery was erroneous and cannot be saved by treating it as a recovery of lost profits under the tort theories will compel reversal of the judgment as to the issue of compensatory damages. That reversal will, of course, also compel reversal of the punitive damage award because of the rule of law requiring some reasonable relationship between the compensatory and punitive damages. (See *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 823-824 [169 Cal.Rptr. 691, 620 P.2d 141]; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) However, even were it otherwise, we would still be required to reverse the judgment as to the issue of damages.

First of all, the $2.5 million award identified in the amended judgment as being punitive damages was classified by the jury in its special verdicts as

compensatory damages for IIPEA. The change made by the court as to the nature of that award was based, so far as the record shows, solely on a statement by the jury foreman that, "That is strictly punitive. We felt that was a punitive question." (See fn. 2, *ante.*) It may well be that something else occurred that does not appear on the record, but insofar as the amended judgment designates the $2.5 million award as punitive damages, on the record it is unsupported by the verdict.

In addition, the total compensatory damages found in the court's amended judgment, $404,153, is $18,299 less than the sum of the $27,194 for IIK and the $395,258 for unjust enrichment. The $18,299 figure appears to represent the amount awarded to J&S for its separate lawsuit; for some reason we have not discovered in the record, the jury deducted the J&S judgment from Ramona's total damages.

Accordingly, we shall reverse the judgment as to damages only, with directions to the trial court to retry the issue of damages, both compensatory and punitive. In view of the retrial on the issue of damages, however, it is necessary that we address several other issues relating to the propriety of punitive damages. (See Code Civ. Proc., § 43.)

### 4. *Selected Punitive Damage Problems*

We reject Care's contention that punitive damages cannot be assessed where a tortfeasor is ignorant of the specific identity of the injured party at the time the tort was committed. Civil Code section 3294, subdivision (c)(1) expressly provides that the "malice" required for the imposition of punitive damages includes ". . . conduct which is carried on by the defendant with a conscious disregard of the rights . . . of others." To prove that a tort was maliciously perpetrated it is not necessary to establish a specific intent to injure the person wronged. (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922 [114 Cal.Rptr. 622, 523 P.2d 662]; *Farmy* v. *College Housing, Inc.* (1975) 48 Cal.App.3d 166, 174 [121 Cal.Rptr. 658].) To be found to have vexatiously and consciously disregarded Ramona's rights in its actual or future contractual relationship with J&S, it was not required that Care know anything more than that some person or entity had been granted a lease to operate the nursing facility commencing July 1, 1980, with the prospect of renewals, or that he, she or it would have obtained such a lease absent Care's wrongfully remaining in possession.

There are many California decisions imposing punitive damages irrespective of the defendant's knowledge of the victim's specific identity. *Taylor* v. *Superior Court (Stille)* (1979) 24 Cal.3d 890 [157 Cal.Rptr. 693, 598

P.2d 854] and its progeny approve punitive recoveries against drunk drivers. (See, e.g., *Peterson* v. *Superior Court (Thompson)* (1982) 31 Cal.3d 147 [181 Cal.Rptr. 784, 642 P.2d 1305] and *Dawes* v. *Superior Court (Mardian)* (1980) 111 Cal.App.3d 82 [168 Cal.Rptr. 319].) Obviously, a drunk driver does not know the specific identity of his victim. Products liability cases imposing punitive damages on manufacturers of pharmaceuticals and medical supplies are also inconsistent with Care's contention; these cases require a conscious disregard of the probable dangerous consequences in marketing the manufacturer's product, not that the manufacturer know the identity of the specific persons who will suffer injury. (See, e.g., *Hilliard* v. *A. H. Robins Co., supra,* 148 Cal.App.3d at pp. 391-392; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 807-808 [174 Cal.Rptr. 348]; cf. *G. D. Searle & Co.* v. *Superior Court (Seaton)* (1975) 49 Cal.App.3d 22, 29-32 [122 Cal.Rptr. 218].) Judicial approval of punitive damage claims in class action disputes is also irreconcilable with Care's "knowledge of identity" argument. (See, e.g., *Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462 [174 Cal.Rptr. 515, 629 P.2d 23]; see also *Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 144 [191 Cal.Rptr. 849].)

The evidence was sufficient to support an award of punitive damages. Care was unjustified and unprivileged in remaining in possession of the nursing facility and in failing to surrender possession consciously disregarded Ramona's rights. Accordingly, the retrial on the issue of damages need not examine the malice issue, except to the extent necessary to determine the amount of punitive damages necessary to effectively punish and deter Care and others from engaging in such tortious activity.

 We also observe in passing that it is not required that the same nine jurors vote in favor of each special verdict. Care's contrary contention is firmly laid to rest by *Juarez* v. *Superior Court* (1982) 31 Cal.3d 759, 768 [183 Cal.Rptr. 852, 647 P.2d 128], in which the court stated: "[S]pecial verdicts apportioning damages are valid so long as they command the votes of *any* nine jurors." (Italics in orig.)

## 5. *Other Issues*

Our decision the judgment must be reversed as to the issue of damages obviates the necessity of our considering several of Care's remaining contentions. Care asserted they lacked sufficient discovery time to depose Ramona's economic expert, Carl Heintz; if Ramona expects to return Heintz to the stand at retrial, Care now has sufficient notice. Similarly, we need

not review Care's contention regarding the jury's use during deliberations of a nonevidentiary damage summary prepared by Ramona's counsel.

 Care's final argument focuses on J&S and its dual role as owner of the property and one-third partner in Ramona. Care has contended throughout this litigation that J&S has recovered twice outside of its role as partner in Ramona, pointing out that J&S was awarded damages in its unlawful detainer litigation and later in its own business tort lawsuit which was consolidated with the case at bar. Care persuaded the trial court to instruct the jury it could award Ramona only two-thirds of its losses resulting from the business torts. Such instruction was erroneous, because Care's assertion that J&S will otherwise receive a repetitious recovery through its partial ownership of Ramona is incorrect.

There is no impropriety in J&S maintaining a dual role as owner of the property and as a one-third partner in the operating lessee of the nursing facility. J&S simply occupies two entirely separate and different legal capacities in this matter: (1) as the owner of the real and, perhaps personal, property making up the nursing facility; and (2) as a one-third partner in the partnership that is the operating lessee of the facility. As owner of the facility it was entitled to compensation for the use of the property; as a partner in the operating lessee partnership it is entitled to a partner's share of the profits, if any, accruing to Ramona from the operation of the skilled nursing facility. Its sharing in profits from operation of the facility does not duplicate what it is entitled to as rent or other compensation for use of the property.

The "identity of parties" condition required to establish the defense of res judicata must be an identity of parties acting in the same capacity. A party appearing in two lawsuits in different capacities will only be estopped by the doctrine of res judicata where that party is in fact litigating the same right in both suits. (See *Meldrim* v. *Board of Supervisors* (1976) 57 Cal.App.3d 341, 346 [127 Cal.Rptr. 52]; see also *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 814 [122 P.2d 892]; 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 285, p. 722.)

Neither a substantial identity of the parties or of litigated rights appears here. J&S's participation in the instant case as a one-third partner in Ramona does not give rise to the same rights J&S prosecuted in the unlawful detainer litigation nor in its own business tort action. The trial court erred, therefore, in instructing the jury it must reduce Ramona's business tort damages by one-third on account of J&S's participation in the partnership.

*Disposition*

The judgment is affirmed insofar as it establishes Care's liability to Ramona for intentional interference with contractual relations and intentional interference with prospective economic advantage. The judgment against Care on the theory of unjust enrichment is reversed. The judgment is further reversed on the issue of damages with directions to the trial court to set the matter for retrial as to the issue of damages, both compensatory and punitive. In the interests of justice each party shall bear its own respective costs on appeal.

McDaniel, J., and Davis, J.,* concurred.

A petition for a rehearing was denied March 5, 1986, and appellants' petition for review by the Supreme Court was denied April 30, 1986.

*Assigned by the Chairperson of the Judicial Council.