Tony Ed MONZINGO, individually and on behalf of all others similarly situated, Appellant,

v.

ALASKA AIR GROUP, INC., a Delaware Corporation, d/b/a Alaska Airlines and Horizon Air Industries, Inc., and Alaska Airlines, Inc., an Alaska Corporation, Appellees.

No. S–11240.

Supreme Court of Alaska.

May 6, 2005.

Dan K. Coffey, Law Offices of Dan K. Coffey, Anchorage, Gilbert W. Gordon, Marks, Marks, & Kaplan, Ltd., Chicago, Illinois, and Michael B. Hyman, Much Shelist Freed Denenberg Ament & Rubenstein, P.C., Chicago, Illinois, for Appellants.

Robert C. Bundy and Jahna M. Lindemuth, Dorsey & Whitney LLP, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

A frequent flyer customer brought a class action lawsuit against Alaska Airlines seeking damages for changes to Alaska Airlines's frequent flyer program that affected the value of his previously earned miles. The superior court granted summary judgment in favor of Alaska Airlines and awarded twenty percent of actual attorney's fees to the airline. We affirm the decision of the superior court and hold that: (1) this breach of contract claim is not preempted by the Airline Deregulation Act; (2) the plain language of the Mileage Plan and reasonable expectations of the parties indicate the intent to allow changes to all aspects of the plan with reasonable notice; and (3) the parties' course of dealing supports the understanding that the airline has the ability to make changes it deems necessary. We reverse the superior court's award of attorney's fees against Monzingo related to the litigation of class certification issues.

## II. FACTS AND PROCEEDINGS

### A. Factual History

This case arises from an uncertified class action, filed by Tony Ed Monzingo, on behalf of 3.9 million class members, seeking over $1 billion in damages. The relevant facts of the case are undisputed. Monzingo is a member of Alaska Airlines's frequent flyer program, the "Alaska Airlines Mileage Plan" (Mileage Plan). The program permits passengers flying on Alaska Airlines to accumulate mileage credit that can later be redeemed for free travel or other awards. Monzingo has been a member of the Mileage Plan since April 23, 1992. From his date of entry into the program on April 23, 1992 until April 2002, Monzingo had accumulated a total of 542,484 miles, most of which had not been redeemed for free travel or other benefits.

Alaska Airlines implemented a number of changes to the Mileage Plan on September 1, 2001. These changes increased the number of miles necessary to redeem peak, first class, and some international travel awards; redemption of awards for off-peak coach travel remained unchanged. Alaska Airlines maintains that this adjustment affected only 16.4% of air travel award levels, accounting for only 21% of all awards redeemed in 2000. The Mileage Plan's changes applied prospectively, to miles to be accrued in the future, as well as retroactively, to miles already accrued but not yet redeemed. Mileage Plan members received their first notice that a change would take place on March 30, 2001. Alaska Airlines issued a press release, posted information about the changes on their website, and sent members notification by e-mail in April 2001. Members were also sent a newsletter in late May 2001 announcing that the changes would go into effect beginning September 1, 2001. In these various publications, Alaska Airlines alerted members that they could redeem their accumulated miles under the old award structure as long as they booked their airline ticket in the subsequent five months, by September 1, 2001, for travel prior to August 1, 2002.

It is undisputed that the "Terms and Conditions" of the Mileage Plan specifically reserved the right to make prospective changes to the plan. The parties' disagreement centers instead on whether Alaska Airlines reserved the right to make retroactive changes to the plan. The "Terms and Conditions" of the Mileage Plan, dated January 1991, were sent to every new member of the frequent flyer program, including Monzingo, who received them in 1992 when he became a member of the plan. The "Terms and Conditions" contained the following warnings:

Alaska Airlines reserves the right *to change the Mileage Plan terms, conditions, partners, mileage credits and/or award levels. This means with prior notice Alaska Airlines may raise award levels* or lower mileage levels, add an unlimited number of blackout dates or limit the number of seats available on any or all flights. Also, certain destinations may be restricted to members. Furthermore, *Alaska Airlines reserves the right to terminate the Mileage Plan with advance notice.* (Emphasis added.)

. . . .

Subject to additions, deletions or revisions at anytime.

. . . .

Accrued mileage and award certificates do not constitute property of the member.

. . . .

Alaska Airlines and/or Travel Partners are the final authority on qualifying mileages. Alaska Airlines may, at its discretion, elect to authorize additional mileage credit between any two points on its route system.

At the end of a section of its "Terms and Conditions" entitled "Important Reminders," Alaska Airlines includes an additional warning printed in bold type:

**All terms and conditions on Mileage Plan awards are subject to change, and the Mileage Plan program is subject to cancellation at any time by Alaska Airlines.**

Although there is no plan language that specifically reserves to Alaska Airlines the right to devalue previously accumulated miles, the Mileage Plan does include a term concerning "previously accumulated mileage." This provision states:

Alaska Airlines reserves the right to disqualify persons from further participation in the Mileage Plan and to cancel all previously accumulated mileage if in Alaska Airlines['s] sole judgement such persons have

violated any of the eligibility, mileage accumulation, award usage or other terms governing the Alaska Airlines Mileage Plan.

### B.  Procedural History

On February 11, 2002, Monzingo filed this lawsuit alleging breach of contract and breach of the implied covenant of good faith and fair dealing. He sought certification of a class of persons who had accumulated miles through the Mileage Plan prior to September 1, 2001. Monzingo amended his complaint twice: on April 4, 2002, his first amended complaint included additional claims for unconscionability and conversion, and on November 12, 2002, his second amended complaint limited the action to only one claim for breach of contract.[1]

Alaska Airlines moved for summary judgment on October 15, 2002. Superior Court Judge Sen K. Tan granted the motion and entered judgment for the airline on September 2, 2003. Following the superior court's order, Alaska Airlines brought a motion for attorney's fees, which was granted on December 17, 2003. Alaska Airlines was awarded $36,877.15; this amount includes $28,226.40, twenty percent of actual attorney's fees, and costs of $8,650.75.

A motion for class certification was filed by Monzingo but was rendered moot by the superior court's grant of summary judgment. The superior court's attorney's fees award included fees for time spent on class certification issues. Alaska Airlines states that "a substantial percentage, if not the majority, of time spent by Alaska Airlines's attorneys . . . was devoted to class certification issues." Monzingo appeals both the order granting summary judgment and the Alaska Civil Rule 82 fee award.

### III.  STANDARDS OF REVIEW

■■■ "[A] grant of summary judgment based upon contract interpretation is subject

---

1. The second amendment by Monzingo appears to have been in response to an order by the superior court of King County, Washington that dismissed another class action brought against Alaska Airlines for changes to its frequent flyer program. The superior court of Washington granted Alaska Airlines's motion to dismiss, which argued that plaintiffs' claims were preempted by the Airline Deregulation Act (ADA) and not cognizable under Washington law. Plaintiffs' claims in that case were dismissed with prejudice. *Chapman v. Alaska Airlines, Inc.,* No. 02-2-22932-8 SEA (Wash.Super.Ct., Sept. 26, 2002).

to de novo review because interpretation of contract language is a question of law."[2] "Drawing all reasonable inferences in favor of the nonmoving party, we will uphold summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."[3] The intent of the parties when entering a contract is, however, reviewed under the clearly erroneous standard.[4] "[S]ummary judgment is improper when the evidence before the superior court establishes a factual dispute as to the intent of the contracting parties."[5]

Trial courts have broad latitude in their award of attorney's fees and costs.[6] We review such awards under the abuse of discretion standard.[7] Abuse of discretion "exists if the award is arbitrary, capricious, manifestly unreasonable, or the result of an improper motive."[8]

## IV. DISCUSSION

### A. Alaska Airlines Did Not Breach Its Contract with Monzingo Because It Reserved the Right To Change the Mileage Plan Retroactively.

#### 1. The breach of contract claim is not preempted by the Airline Deregulation Act.

■ We consider first the threshold question whether all issues in this case are preempted by the Airline Deregulation Act (ADA).[9] The ADA provides that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."[10] The United States Supreme Court has addressed whether state law claims are preempted by the ADA on two occasions: first, in *Morales v. Trans World Airlines, Inc.*, where the Court held that "[s]tate enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted" under the ADA,[11] and three years later in *American Airlines, Inc. v. Wolens.*[12] *Wolens* was similar to this case in that it involved a suit against American Airlines for retroactive modification of its frequent flyer program. The *Wolens* Court held that the ADA did preempt the plaintiffs' claims that were based on the Illinois Consumer Fraud and Deceptive Business Practices Act but did not preempt a state law breach of contract claim.[13] The *Wolens* Court explained that it did "not read the ADA's preemption clause ... to shelter airlines from suits ... seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings."[14] Although *Wolens* was almost identical on its facts to the instant case, the *Wolens* Court did not address the contract claim on the merits, noting that the "question of contract interpretation has not yet had a full airing, and we intimate no view on its resolution."[15]

Alaska Airlines contends that state law principles of contract interpretation should not be applied in this case because they

**2.** *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 711–12 (Alaska 2003) (citing *American Computer Inst., Inc. v. State*, 995 P.2d 647, 651 (Alaska 2000)).

**3.** *Nichols v. State Farm Fire & Cas. Co.*, 6 P.3d 300, 303 (Alaska 2000); *see also* Alaska Civil Rule 56(c).

**4.** *K & K Recycling*, 80 P.3d at 712 (citing *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1167 (Alaska 1998)).

**5.** *Id.*

**6.** *Bliss v. Bobich*, 971 P.2d 141, 147 n. 5 (Alaska 1998).

**7.** *McNett v. Alyeska Pipeline Serv. Co.*, 856 P.2d 1165, 1167 (Alaska 1993).

**8.** *Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 793 (Alaska 1997) (citing *Mt. Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 834 (Alaska 1995)).

**9.** 49 U.S.C. § 41713(b)(1) (1996).

**10.** *Id.*

**11.** 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

**12.** 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995).

**13.** *Id.* at 219, 227, 115 S.Ct. 817.

**14.** *Id.* at 228, 115 S.Ct. 817.

**15.** *Id.* at 234, 115 S.Ct. 817.

would "enlarge or enhance [Monzingo's] rights ... based on state laws or policies external to the agreement, as expressly prohibited by *Wolens*." While *Wolens* does forbid enlargement or enhancement of rights based on state laws or policies, this prohibition does not extend to such contract construction issues as whether an airline has reserved the right to retroactively change rules governing frequent flyer credits.[16] The *Wolens* Court concluded only that state-law principles should be preempted "to the extent they seek to effectuate the State's public policies, rather than the intent of the parties."[17] Subsequent decisions have interpreted this language to mean that contract actions seeking invalidation of express contract terms,[18] enforcement of equitable remedies,[19] or punitive damages[20] are preempted, because they would "impermissibly enlarge[ ] the scope of the proceedings beyond the parties' agreement."[21] But if the parties "seek to enforce a term implied in fact in the agreement based upon the parties' reasonable expectations," no preemption problem is presented.[22]

Here, the superior court was asked to interpret the meaning of the words of the Mileage Plan in order to give effect to the reasonable expectations of the parties. Rules governing contract interpretation—such as the use of extrinsic evidence to ascertain the meaning of the parties—only attempt to divine the parties' intent and are permissibly applied in resolving state contract claims. Thus, we examine this contract to determine if there was a breach of Alaska Airlines's "self-imposed undertakings."[23]

2. **The mileage plan as a whole reflects the intent to allow Alaska Airlines the ability to change the plan retroactively.**

▮ When interpreting contracts, the trial court's goal is to "give effect to the reasonable expectations of the parties."[24] Courts look to the language of the contract as a whole, the objects sought to be accomplished by the contract, the circumstances surrounding its adoption, and case law interpreting its provisions to ascertain the reasonable expectations of the parties.[25] While extrinsic evidence should be consulted, "after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important

---

16. *See id.* at 233–34, 115 S.Ct. 817.

17. *Id.* at 233 n. 8, 115 S.Ct. 817.

18. *See, e.g., Breitling U.S.A. v. Federal Express Corp.,* 45 F.Supp.2d 179, 184 (D.Conn.1999) (contract claim preempted when based on doctrines of estoppel and waiver to invalidate express terms).

19. *See, e.g., Osband v. United Airlines, Inc.,* 981 P.2d 616, 621–22 (Colo.App.1998) (contract claim preempted when based on promissory estoppel, a remedy created by state law to prevent injustice).

20. *See, e.g., Travel All Over the World, Inc. v. Saudi Arabia,* 73 F.3d 1423 (7th Cir.1996) (punitive damages claim preempted, but claim for failure to honor reservations allowed because it was a "self-imposed commitment" of airline).

21. *Waul v. American Airlines, Inc.,* 2003 WL 22719273, at *3 (Cal.App., Nov.17, 2003) (finding each cause of action preempted under the ADA where the complaint did not allege an independent claim for breach of contract) (citing *Travel All Over the World,* 73 F.3d at 1423).

22. *Id.* at *3. The general purpose of preemption under the ADA is to avoid state interference with federal deregulation. "Nothing in the Act itself, or its legislative history, indicates that Congress had a 'clear and manifest purpose' to displace state [laws] in actions that do not affect deregulation in more than a 'peripheral manner.' " *Air Transport Ass'n of Am. v. City & County of San Francisco,* 266 F.3d 1064, 1070 (9th Cir.2001) (citing *Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1265 (9th Cir.1998) (en banc)); *see also Travel All Over the World,* 73 F.3d at 1432 ("*Morales* and *Wolens* allow us to discern two distinct requirements for a law to be expressly preempted by the ADA: (1) A state must 'enact or enforce' a law that (2) 'relates to' airline rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them.").

23. *Wolens,* 513 U.S. at 228, 115 S.Ct. 817.

24. *Stepanov v. Homer Elec. Ass'n, Inc.,* 814 P.2d 731, 734 (Alaska 1991) (quoting *Mitford v. de Lasala,* 666 P.2d 1000, 1005 (Alaska 1983)).

25. *Craig Taylor Equip. Co. v. Pettibone Corp.,* 659 P.2d 594, 597 (Alaska 1983) (citations omitted).

evidence of intention."[26] The parties to this dispute agree that the Mileage Plan is a contract.[27] We must therefore begin by examining the plain language of the Mileage Plan to determine whether the terms and conditions of the plan reserve Alaska Airlines's right to make retroactive changes. Next, we analyze the reasonable expectations of the parties at the time that Monzingo agreed to the terms of the Mileage Plan. We finally turn to the parties' course of dealing as further evidence of their reasonable expectations of the Mileage Plan.

### a. The plain language of the Mileage Plan reserves Alaska Airlines's right to make retroactive changes to the plan.

Courts examine the contract as a whole when assessing the intent of the parties.[28] In this case, we must examine the nature of restrictions that Alaska Airlines informed its members would apply to the Mileage Plan. The inside front cover of the "Terms and Conditions" brochure that is mailed to every new Mileage Plan member contains the following language to warn members about possible changes to the plan: "Alaska Airlines reserves the right to change the Mileage Plan terms, conditions, partners, mileage credits and/or award levels." Additional warnings run throughout the "Terms and Conditions," including: "Alaska Airlines may raise award levels or lower mileage levels," and "[s]ubject to additions, deletions, or revisions at any time." Bold text in the brochure reiterates that "[a]ll terms and conditions on Mileage Plan awards are subject to change...."

**26.** RESTATEMENT (SECOND) OF CONTRACTS § 212, comment b; *see also Still v. Cunningham*, 94 P.3d 1104, 1109 (Alaska 2004).

**27.** Alaska Airlines states that "[t]he Mileage Plan is a marketing and promotional program," but they do not dispute that it is a contract. Their argument focuses on whether the terms of the Mileage Plan reserved to them the right to make changes to the plan.

**28.** *See Craig Taylor Equip. Co.*, 659 P.2d at 597.

**29.** We need not address Monzingo's arguments that form contracts and ambiguities in contract language are generally construed against the

Monzingo contends that these terms give Alaska Airlines the right to change award levels, as long as the changes do not apply to previously accumulated miles. But, as Alaska Airlines points out, it has also informed Mileage Plan members in its "Terms and Conditions" that "[a]ccrued mileage and award certificates do not constitute property of the member," and that "Alaska Airlines reserves the right to terminate the Mileage Plan with advance notice." We conclude that these provisions manifest an intent to clarify that members have no ownership right in the miles they have earned and thus cannot expect that the "value" of these miles will not diminish due to changes in the award levels. Because these provisions informed members that they have no vested right in their previously accumulated mileage, when read in conjunction with the other provisions of the plan, these terms appear to be an additional way of saying that Alaska Airlines has the power to alter or change the value of miles.[29]

### b. The parties reasonably expected the Mileage Plan to allow Alaska Airlines the right to retroactively change all aspects of the plan.

In interpreting contracts, we also look at the reasonable expectations of the parties. We aim "to give effect to the meaning of the words which the party ... should reasonably have apprehended ... would be understood by the other party."[30]

In support of his argument that Alaska Airlines did not reserve the right to retroactively devalue previously accumulated miles, Monzingo relies principally on the Illinois Supreme Court's decision in *Wolens*.[31]

drafter. Ambiguities in contractual language are only to be construed against the drafter "in the absence of other means of ascertaining the reasonable expectations of the parties." *DeCristofaro v. Sec. Nat'l Bank*, 664 P.2d 167, 169 (Alaska 1983).

**30.** *Id.* (citing *Arctic Contractors, Inc. v. State*, 564 P.2d 30 (Alaska 1977)) (additional citations omitted).

**31.** *Wolens v. American Airlines*, 157 Ill.2d 466, 193 Ill.Dec. 172, 626 N.E.2d 205 (1993), *rev'd in part on other grounds*, 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). He also relies on

There, the court remarked: "American chose to retroactively alter the terms of the frequent flyer program. This action constituted a breach of contract which entitled plaintiffs to pursue an available remedy."[32] But as Alaska Airlines points out, this language is dicta.[33] And the United States Supreme Court did not reach this issue when it reviewed that decision.[34]

Alaska Airlines relies on *Benway v. American Airlines, Inc.*[35] and *Grossman v. USAir, Inc.*[36] to support its argument that it reserved the right to make both prospective and retroactive changes to the Mileage Plan. In *Benway*, a Texas trial court judge granted American Airlines's motion for summary judgment based on the reservation of rights language in American's frequent flyer program. Contract interpretation was the only issue raised on summary judgment. American Airlines's AAdvantage Program states:

> American Airlines may find it necessary to change AAdvantage program rules, regulations, travel awards and special offers at any time. This means that American may initiate changes impacting, for example, participant affiliations, rules for earning mileage credit, mileage levels and rules for the use of travel awards. . . .

Monzingo complains that American Airlines's terms are more explicit than Alaska Airlines's. We disagree. The reservation of rights language in American Airlines's program is less clear than Alaska Airlines's. Alaska Airlines uses unequivocal language stating it "reserves the right to change the Mileage Plan," rather than American Airlines's language: "may find it necessary to change AAdvantage program rules."

In *Grossman*, a Pennsylvania trial court granted a motion for summary judgment in favor of USAir, finding that the terms of the contract unambiguously permitted USAir to raise mileage levels in a manner that reduced the value of previously accrued miles.[37] USAir's reservation of rights language was almost identical to the language used by Alaska Airlines, informing program members:

> USAir reserves the right to change the Frequent Traveler Program rules, regulations, partners, mileage credits, or award levels. This means that, with notice, USAir may raise award or mileage levels, add an unlimited number of blackout days, or limit the number of seats available to any or all destinations. . . .

The *Grossman* court found it significant that USAir's contract language followed the National Association of Attorneys General (NAAG) Guidelines.[38] NAAG, an organization that is composed of the attorneys general of all fifty states, adopted Air Travel Industry Enforcement Guidelines in 1987.[39] These guidelines were drafted following the deregulation of the airline industry and were designed to "explain in detail how existing state laws apply to air fare advertising and frequent flyer programs."[40] The guidelines provided detailed standards governing the content and format of airline advertising and addressing the recommended structure and advertising of frequent flyer programs. The reservation of rights language in USAir's and Alaska Airlines's frequent flyer programs is modeled on the language of the NAAG Guidelines.[41] Although the *Grossman* court

---

oral findings made by an Illinois Circuit Court in *Gutterman v. American Airlines, Inc.*, No. 95 CH 982 (Ill.Cir.Ct., March 11, 1996).

32.  *Wolens*, 193 Ill.Dec. 172, 626 N.E.2d at 208.

33.  The Illinois Supreme Court stated that the only issues before the court were whether certain claims were preempted by the Airline Deregulation Act. *Id.* 193 Ill.Dec. 172, 626 N.E.2d at 206.

34.  *See Wolens*, 513 U.S. at 235, 115 S.Ct. 817.

35.  No. 95–01379–L (Tex. Dist. Ct., June 16, 1995).

36.  33 Phila. Co. Rptr. 427 (Ct.Com.Pl.1997).

37.  *Id.* at 432.

38.  *Id.* at 433.

39.  *Morales*, 504 U.S. at 379, 112 S.Ct. 2031.

40.  *Id.* (quoting NAAG Guidelines, Introduction (1988)).

41.  A copy of the NAAG Guidelines is attached as an appendix to the Supreme Court's decision in *Morales*. *See Morales*, 504 U.S. at 391–419, 112 S.Ct. 2031. The key provision of the NAAG Guidelines relates to vested and nonvested miles. Nonvested miles accrue after an airline has given 'adequate notice.' The guidelines's suggestion

noted this similarity, its decision was also based on state law interpretation of USAir's contract language. The *Grossman* court concluded that this language was susceptible to only one reasonable interpretation: that USAir could devalue accumulated miles by increasing levels needed to obtain free travel.[42]

Relying on *Morales*, Monzingo argues that the NAAG Guidelines are preempted by the ADA. But in concluding that "the fare advertising provisions of the NAAG Guidelines are pre-empted by the ADA,"[43] the *Morales* Court was careful to narrowly circumscribe the preempted portion to include only fare advertising provisions of the NAAG Guidelines—not the language addressing frequent flyer programs.[44] More importantly, Alaska Airlines does not argue that the NAAG Guidelines are enforceable, and indeed, the task force did not appear to intend them to be enforceable.[45] Alaska Airlines maintains that its adoption of language nearly identical to that suggested by the guidelines provided members with additional notice that modification of award levels could affect previously accumulated miles.[46] Although we are reluctant to conclude that the NAAG Guidelines provided any notice to members, we agree that the guidelines offer some indication that it was reasonable for Alaska Airlines to expect that they were reserving the right to retroactively devalue previously accumulated miles.

When read as a whole, the contract does not envision a plan in which members redeem awards based on the award structure in place at the time that particular miles were accrued by the customer. As Alaska Airlines argues, it would not be reasonable for a customer to expect this because it would create an administrative nightmare for the airline and the customer to track the value of miles relative to the status of the plan at the time of a particular flight. And there are no provisions in the detailed language of the plan's terms that would lead a member to believe that Alaska Airlines or the member would be required to track award amounts with each modification. Read as a whole, the Mileage Plan is structured to give Alaska Airlines the power to make changes with adequate prior notice. Here, Monzingo was given notice of the changes in late March 2001. He had sixteen months following the date of this announcement to travel on previously accrued miles, and five months after the announcement to book this travel.[47] Moreover, the NAAG Guidelines provide evidence that it was reasonable for Alaska Airlines to believe the contract language was specific enough to convey the intent to reserve the right to make retroactive changes. We conclude that the contract was sufficiently unambiguous on the issue of previously accumulated miles to warrant summary judgment.

c. **The course of dealing between the parties indicates Monzingo understood that Alaska Airlines reserved the right to make changes to accumulated miles.**

We next turn to the course of dealing between Monzingo and Alaska Airlines

---

for adequate notice language was found in *Grossman* to be nearly identical to USAir's reservation of rights language. *See Grossman*, 33 Phila. Co. Rptr. at 433. Alaska Airlines argues the Mileage Plan provision is also identical. The NAAG guideline for adequate notice states: "(Airline) reserves the right to change the program rules, regulations and mileage level. This means that (Airline) may raise mileage levels, add an unlimited number of blackout days, or limit the number of seats available...." NAAG Guidelines § 3.2.3 (1988).

**42.** *Grossman*, 33 Phila. Co. Rptr at 433.

**43.** *Morales*, 504 U.S. at 391, 112 S.Ct. 2031.

**44.** *Id.* at 381–89, 112 S.Ct. 2031 (holding enforcement of the NAAG fare advertising guide-

lines through a State's general consumer protection laws is preempted by the ADA).

**45.** The introduction to the NAAG Guidelines states: "It is important to note that these Guidelines do not create any new laws or regulations regarding the advertising practices or other business practices of the airline industry. They merely explain in detail how existing state laws apply to air fare advertising and frequent flyer programs." NAAG Guidelines, Introduction (1988).

**46.** Monzingo became a member of the Mileage Plan in 1992, only four years following the adoption of the NAAG Guidelines.

**47.** Monzingo could book travel until August 31, 2001, for travel anytime up to August 1, 2002.

and consider whether the parties' previous dealings supply additional evidence of their reasonable expectations of the Mileage Plan. Alaska Airlines argues that the frequent unilateral changes made by Alaska Airlines to the plan during Monzingo's membership indicate Monzingo understood the plan was subject to retroactive changes. Alaska Airlines maintains that award levels were increased twelve times since Monzingo joined the plan, and thirteen travel awards were discontinued during his membership. At no point prior to this lawsuit did Monzingo call to complain about the changes, although he was admittedly aware of them.

█ Alaska Statute 45.01.205 provides that "express terms of an agreement and an applicable course of dealing or usage of trade shall be construed where reasonable as consistent with each other...."[48] "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."[49] We held in *Fairbanks North Star Borough v. Tundra Tours, Inc.* that a school district's payment to a school bus company over two years manifested an assent to the billing methodology of the bus company and that the parties' course of dealing should govern the interpretation of the billing methodology.[50] As we explained, "a course of dealing between parties must prevail over an industry practice in determining the reasonable intention of the parties in using particular terminology."[51] In this case, we similarly conclude that Monzingo assented to the numerous changes made by Alaska Airlines. His actions provide an additional indication of his reasonable expectations at the time of

drafting: that Alaska Airlines reserved the right to make changes to the value of previously accumulated miles. Based on the plain language of the plan, the reasonable expectations of the parties, and the parties' course of dealing, we hold that Alaska Airlines reserved the right to make retroactive changes to the Mileage Plan with reasonable notice.

**B. It Was Error To Award Attorney's Fees Against Monzingo for Litigation of Class Certification Issues.**

█ Monzingo contends that the award of attorney's fees in this case is contrary to the purpose of Alaska Civil Rule 82 and public policy. At no point does Monzingo contend that the superior court's award of fees was an abuse of discretion that warrants reversal. Rather, he argues that we should create a separate category under Rule 82 for private litigants pursuing "quasi-public" issues. Both parties agree that Monzingo is not a true public interest litigant, and hence is not automatically exempt from Rule 82 fees.[52] The lawsuit was for over $1 billion in damages and Monzingo had sufficient private economic incentive to bring the suit. Instead, Monzingo asserts that "because so many Alaska citizens are affected by the contested issue, and the damages are very small as to each individual," attorney's fees should not be assessed when the claim is not frivolous and the class representative acts in good faith. We are unconvinced that class representatives motivated to bring suit by their own private economic interests should fall completely outside the ambit of Rule 82. We are, however, persuaded by Monzingo's argument that a future class representative seeking a small amount of relief will be dissuaded from becoming a named plaintiff in a class action suit if he risks high attorney's

**48.** AS 45.01.205(d).

**49.** AS 45.01.205(a).

**50.** 719 P.2d 1020, 1033 (Alaska 1986).

**51.** *Id.* at 1033–34.

**52.** We consider four factors as indicia of public interest litigation:
    (1) the effectuation of strong public policies;
    (2) numerous people will receive benefits from the lawsuit;

    (3) only a private party could have been expected to bring this action; and
    (4) the public interest litigant would not have sufficient economic incentive to bring the suit if the action only involved issues lacking general importance.
*Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991) (citing *Anchorage Daily News v. Anchorage Sch. Dist.*, 803 P.2d 402, 404 (Alaska 1990)).

fees for litigation that goes beyond that required to adjudicate the merits of his own case. Thus, the question before us is whether a class representative should be liable for Rule 82 attorney's fees arising from litigation on issues related solely to class certification and notice, when that litigation is for the benefit of putative class members and offers no monetary benefit to the named plaintiff.

"Alaska is the only state that does not follow the American rule [pertaining to attorney's fees]."[53] "Under the 'American rule,' each party pays its attorney's fees, regardless of who prevails."[54] "The purpose of Rule 82 is to partially compensate a prevailing party for the expenses incurred in winning his case. It is not intended as a vehicle for accomplishing anything other than providing compensation where it is justified."[55] Rule 82 was not intended to penalize a party for litigating a good-faith claim.[56]

Rule 82(b)(3)(I) permits a court to reduce or deny attorney's fees to a prevailing party if "a given fee award may be so onerous to the non-prevailing party that it would deter similarly situated litigants from the voluntary use of the courts."[57] We have previously expressed concern that " 'financially ruinous' fee awards against good faith civil litigants could deter access to the courts."[58] Although we recognize that a trial court does not need to "explain its analysis of all possible reasons, under Rule 82(b)(3), for deviating from the schedule,"[59] it must give adequate consideration of the factors when raised by the parties. Moreover, class representatives are a unique group of plaintiffs. Named plaintiffs in class actions are particularly susceptible to financially ruinous or onerous fee awards in the event of an adverse judgment, especially following our recent holding in *Turner v. Alaska Communications Systems*[60] that the costs of litigating should not be born by absent class members. Hence, fee awards against named class representatives warrant greater scrutiny and a delicate balancing of the relevant equitable factors articulated in Rule 82(b)(3).[61]

We did not address in *Turner* the extent and sweep of Rule 82's application to class representatives. We therefore turn to the narrow issue raised in this case: whether a named plaintiff can be held liable for attorney's fees and costs incurred that have no bearing on the merits of the named plaintiff's lawsuit. This appears to be a novel issue that arises out of Alaska's unique two-way fee-shifting provision, Rule 82.[62] The question posed is whether the policies behind Rule 82 support imposing attorney's fees on a named plaintiff when those fees include extensive class certification preparation that falls outside the substantive merits of the

**53.** *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 755 (Alaska 1996).

**54.** *Id.*

**55.** *Tobeluk v. Lind*, 589 P.2d 873, 876 (Alaska 1979) (citations omitted); *see also State v. Abbott*, 498 P.2d 712 (Alaska 1972); *DeWitt v. Liberty Leasing Co.*, 499 P.2d 599, 602 (Alaska 1972).

**56.** *See Reid v. Williams*, 964 P.2d 453, 462 (Alaska 1998); *see also Malvo v. J.C. Penney Co. Inc.*, 512 P.2d 575, 586–88 (Alaska 1973).

**57.** Alaska R. Civ. P. 82(b)(3)(I).

**58.** *Reid*, 964 P.2d at 462 (citations omitted).

**59.** *Osborne v. Hurst*, 947 P.2d 1356, 1362 n. 3 (Alaska 1997) ("If one or more Rule 82(b)(3) factors justifies departure from the schedule for fee awards, the trial court may base its decision on those factors, without specifically explaining why the other factors are not relevant.").

**60.** *See Turner v. Alaska Communications Sys. Inc.*, 78 P.3d 264 (Alaska 2003) (holding that absent class members could not be held liable for attorney's fees upon an adverse judgment); *see also Catalina Yachts v. Pierce*, 105 P.3d 125, 131 (Alaska 2005) (holding Rule 68 applies to named class representatives upon an adverse judgment).

**61.** *See* Civil Rule 82(b)(3)(K) (permitting variation in the attorney's fees award if "other equitable factors [are] deemed relevant" by a trial court).

**62.** We note that most fee-shifting statutes provide attorney's fees only to plaintiffs for certain causes of action, usually in order to encourage the filing of smaller claims or causes of action stemming from civil rights violations. For additional discussion of the history of Rule 82 and the American attorney's fee rule see Susanne DiPietro & Teresa W. Carns, *Alaska's English Rule: Attorney's Fee Shifting in Civil Cases*, 13 ALASKA L.REV. 33 (1996).

named plaintiff's case.[63]

The United States Supreme Court recognized in *United States Parole Commission v. Geraghty* that a named plaintiff "presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class."[64] A class representative's interest in having a class certified is "more analogous to the private attorney general concept than to the type of interest traditionally thought to satisfy the 'personal stake' requirement."[65] The United States Supreme Court further explained in *Deposit Guaranty National Bank v. Roper* that "the denial of class certification [is] an example of a procedural ruling, collateral to the merits of a litigation. . . ."[66] The Supreme Court in *Roper* found that the use of the class action procedure may offer a substantial advantage for a named plaintiff who may divide attorney's fees and costs among all members of the class who benefit from any recovery and therefore achieve a less-costly means of litigating their single claim.[67] But this "significant benefit to claimants . . . of reducing their costs of litigation"[68] quickly transforms

into an economic hardship to the named plaintiff if class representatives are held liable for all of the fees incurred in litigating class certification issues. As the Supreme Court stated in *Roper*, "[t]ypically, the attorney's fees of a named plaintiff proceeding without reliance on [the federal class action rule] could exceed the value of the individual judgment in favor of any one plaintiff."[69] In this case, Monzingo is asked to pay $28,226.40 in attorney's fees and $8,650.75 in costs. Yet Monzingo argues that "[h]is total damages had he prevailed ranged from a few hundred to a few thousand dollars."

■ Class representatives will frequently have less at stake than Monzingo, largely because "negative value suits"[70] are a primary reason the class device exists.[71] Moreover, class action defendants are highly motivated to vigorously defend any class action. Not only are the monetary stakes high in most class actions, but defeat of a class action may preclude later claims by absent members of the putative class and can often foreclose devastating public relations and reputation costs for a company.[72] Alaska

---

**63.** One federal district court rejected a prevailing plaintiff's request for attorney's fees under a fee-shifting civil rights statute for fees related to an unsuccessful attempt to obtain class certification; the court separated out all discrete time that counsel spent on class issues in the case from the fee award. *See Webster Greenthumb Co. v. Fulton County, Ga.,* 112 F.Supp.2d 1339, 1350–51 (N.D.Ga.2000); *see also* 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 14.3, at 517–21 (4th ed.2002). We note, however, that *Fulton County* follows the Eleventh Circuit's holding that fee awards may be reduced following a task-by-task examination of the fees assessed or by a reduction on a percentage basis. *See American Civil Liberties Union of Georgia v. Barnes,* 168 F.3d 423, 427 (11th Cir.1999). Rule 82 creates a separate structure for analyzing fee requests.

**64.** 445 U.S. 388, 402, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

**65.** *Id.* at 403, 100 S.Ct. 1202; *see also Love v. Turlington,* 733 F.2d 1562, 1565 (11th Cir.1984) (quoting *Geraghty* ).

**66.** 445 U.S. 326, 336, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

**67.** *Id.* at 338 n. 9, 100 S.Ct. 1166.

**68.** *Id.*

**69.** *Id.*

**70.** "A 'negative value suit' is one in which class members' claims 'would be uneconomical to litigate individually.' " *In re Monumental Life Ins. Co.,* 365 F.3d 408, 411 n. 1 (5th Cir.2004) (quoting *Phillips Petroleum v. Shutts,* 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

**71.** *See, e.g., Roper,* 445 U.S. at 339, 100 S.Ct. 1166 ("[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device"); *see also Castano v. American Tobacco Co.,* 84 F.3d 734, 748 (5th Cir.1996) (stating "[t]he most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit").

**72.** *See* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichs Eroding Our Day in Court and Jury Trial Commitments?* 78 N.Y.U. L.REV. 982, 1043–44 (2003) ("[T]he defendant may expend a significant amount of resources on the [summary judgment] motion in an early case, making it very costly to defend against. Another, related possible effect of a repeat litigant's development of a reputation for

Airlines admitted as much when arguing for enhanced attorney's fees: "Faced with a billion dollar damages claim, a simultaneous motion to certify a 3.8 million member class, and expert counsel brought in from the Outside, Alaska Airlines was forced to respond in a proportionate manner . . . [and] expended a reasonable number of hours and resources given the magnitude of Plaintiff's claim."

Rule 82(b)(3)(J) permits variance from the attorney's fees schedule in situations where the prevailing party may have been motivated by other considerations "such as a desire to discourage claims by others against the prevailing party or its insurer."[73] As we explained in *Catalina Yachts,* "we must be careful about allowing fee-shifting provisions to undercut provisions meant to encourage plaintiffs to bring meritorious claims."[74] We are just as concerned about the chilling effect that Rule 82 may have on class actions if applied too rigidly against named plaintiffs as we were about absent class members' liability for fees in *Turner.*[75] In *Turner,* we distinguished between awards of fees against named class representatives and awards sought against absent class members, explaining that "our ruling does not eliminate Rule 82 attorney's fees in class actions; it simply limits Rule 82's possible reach to named parties, meaning that a person who has been forced to litigate in order to secure his or her rights will be reimbursed in part for litigation expenses."[76]

Monzingo's motion for class certification was rendered moot by the superior court's grant of summary judgment. Nevertheless, the trial court awarded attorney's fees that included time spent by Alaska Airlines in preparing for and arguing the motion to cer-

tify the class. Although the superior court awarded only twenty percent of actual fees in accordance with the Rule 82(b) schedule, Alaska Airlines admits that "a substantial percentage, if not the majority" of time listed on its invoices was devoted to class certification issues. Monzingo argues that because the superior court never ruled on the class certification motion, Alaska Airlines did not prevail on the class certification issue and thus should not be eligible to receive fees related to that issue. We disagree. We have previously held that trial courts are not required to award fees on an issue-by-issue basis: "Rule 82(a) does not require that attorney's fees be calculated with reference to the disposition of individual issues. . . . [T]he party who prevails on the principal dispositive issue is entitled to reasonable costs calculated according to the trial court's discretion."[77]

But we are convinced that there is an essential difference between limiting the attorney's fees for which a class representative may be liable in litigating the merits of his own claim and exposing that named plaintiff to the additional risk of having to pay substantial fees litigating class certification and notice issues on behalf of absent class members. A named plaintiff serving as class representative functions in two distinct roles: to litigate the merits of his own claim and to litigate on behalf of unnamed class members. He has a financial incentive to litigate his own claims. But when a class representative has no personal financial interest in the second role, he functions in much the same manner as a private attorney general in a public interest law suit.[78] In such situations,

aggressiveness with regard to summary judgment may be to intimidate or inhibit other potential plaintiffs who may not have the resources to invest in costly litigation.").

73. Alaska Civil Rule 82(b)(3)(J) permits a variation in the fee award to "the extent to which the fees incurred by the prevailing party suggest that they had been influenced by considerations apart from the case at bar, such as a desire to discourage claims by others against the prevailing party or its insurer."

74. 105 P.3d at 131.

75. 78 P.3d at 269.

76. *Id.*

77. *Tenala, Ltd. v. Fowler,* 993 P.2d 447, 450 (Alaska 1999) (quoting *Gold Bondholders Protective Council v. Atchison, Topeka & Santa Fe Ry. Co.,* 658 P.2d 776, 779 (Alaska 1983)).

78. *See, e.g., Anchorage v. McCabe,* 568 P.2d 986, 990 (Alaska 1977) (stating that "awards of attorney's fees to public interest plaintiffs have long been an exception to that general no-fee rule" and citing *Newman v. Piggie Park Enter., Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) as authority to support "the award of attorney's fees to 'private attorneys general' ").

it is necessary to distinguish between the attorney's fees spent by a prevailing defendant who has incurred fees defending both the merits of the individual plaintiff's claims and the structure of the class action litigation. Moreover, fees incurred by a prevailing defendant litigating procedural motions related solely to the class action structure of the litigation are often driven by a defendant's desire to limit damages to the named plaintiff's individual claim. In such a case, the fee award should be varied under Rule 82(b)(3)(J), since the vigorous defense of a class certification motion is motivated by the "desire to discourage claims"[79] that permits variance under Rule 82(b)(3). Permitting the threat of additional liability for fees and costs related to defending class-specific procedural claims will discourage plaintiffs from acting as class representatives. We conclude that this is a core purpose of permitting a trial court to vary a fee award under Rule 82(b)(3)(I).

We therefore hold that a named plaintiff should not ordinarily be held liable for attorney's fees that fall beyond the scope of litigating the merits of his claim. Our ruling does not eliminate the award of Rule 82 attorney's fees against unsuccessful named plaintiffs in class action lawsuits; it simply limits Rule 82's reach to the substantive merits of their claims. We note, however, that Monzingo, as non-prevailing party, bears the burden of showing case-specific circumstances that warrant a downward variance under Rule 82(b)(3). Thus, it is Monzingo's burden to demonstrate that his motive for serving as class representative was limited to the value of his individual claim and was not related to any potential enhanced recovery for his role as class representative.[80]

## V. CONCLUSION

Because the plain language of Alaska Airlines's Mileage Plan read as a whole reflects

the parties' reasonable expectations to allow changes to all aspects of the plan with reasonable notice, including changes to previously accumulated miles, and because the parties' course of dealing further supports the understanding that the airline has the ability to make retroactive changes, we AFFIRM the decision of the superior court granting summary judgment to Alaska Airlines. Because the superior court's award of twenty percent of attorney's fees relating to the litigation of class certification issues was error, we VACATE the fee award and REMAND for a determination of Rule 82 attorney's fees arising from litigation of the substantive merits of Monzingo's claim.

EASTAUGH, Justice, not participating.

---

79. Alaska R. Civ. P. 82(b)(3)(J).

80. Alaska Airlines suggests that Monzingo may have been eligible for "an enhanced recovery" for agreeing to act as class representative and cites *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 272 (S.D.Ohio 1997) as evidence that "courts routinely approve incentive awards

to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the litigation." *Id.* Because the record is silent on whether Monzingo stood to gain additional monetary benefit for his role as class representative, this is a determination that can be made by the trial court on remand.